**UNI\*QUALITY, INCORPORATED,**
**an Illinois corporation,**
**Plaintiff–Appellant,**

**v.**

**INFOTRONX, INCORPORATED, an Illinois corporation, Charles J. Baker, individually, and Wade Baker, individually, Defendants–Appellees.**

**No. 91–3554.**

United States Court of Appeals,
Seventh Circuit.

Argued June 12, 1992.

Decided Sept. 10, 1992.

Suzan Sutherland, Mary Jane Fait (argued), Siegal, Lynn & Capitel, Northbrook, Ill., for plaintiff-appellant.

Steven J. Rosenberg (argued), Chicago, Ill., for defendants-appellees.

Before CUMMINGS and MANION, Circuit Judges, and GORDON, Senior District Judge.*

MANION, Circuit Judge.

Infotronx, Inc. could not (or would not) pay Uni*Quality, Inc., a company it had hired to perform services for it, despite promises to pay for those services. Characterizing the promises as false representations and part of scheme to defraud it of the value of its services, Uni*Quality sued Infotronx, Charles Baker, Infotronx's president, and Wade Baker, Infotronx's vice-president, in federal court. Uni*Quality's suit alleged that Infotronx violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 (RICO); mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, were the alleged predicate acts. The complaint also alleged supplemental state law fraud and breach of contract claims. The district court dismissed Uni*Quality's RICO claim and relinquished jurisdiction over the state law claims pursuant to *United Mineworkers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The court subsequently denied

---

* Hon. Myron L. Gordon, Senior District Judge of the Eastern District of Wisconsin, is sitting by designation.

Uni*Quality's motion under Fed.R.Civ.P. 59 to amend its judgment and denied Uni*Quality's request for leave to amend its complaint. Uni*Quality appeals, and we affirm.

## I.

Since we are reviewing the grant of a motion to dismiss, our review is de novo. *Caldwell v. City of Elwood*, 959 F.2d 670, 671 (7th Cir.1992). We take all facts alleged in the complaint, as well as any reasonable inferences from those facts, in the light most favorable to Uni*Quality. *Id.*

Uni*Quality's complaint alleged that in January 1990, Infotronx began work on a project for the May Company to develop a computer software package for labor scheduling. In the spring of 1990, Infotronx presented a labor scheduling system to May, which May rejected. Shortly thereafter, Infotronx began to hire various software companies to help develop the labor scheduling system, despite the fact that Infotronx knew it did not have the funds to complete the project. Among these companies was Uni*Quality.

The complaint details Infotronx's hiring of Uni*Quality, and various meetings and conversations between representatives of the two companies during the course of the companies' business relationship. In July 1990, Tom Gruenwald, Uni*Quality's president, and Don O'Brien, its recruiting manager, met with Wade Baker and Randolph Reitz, an Infotronx vice-president, to discuss the services Uni*Quality might provide for Infotronx. During this meeting, Infotronx's representatives urged Uni*Quality to send resumes of some Uni*Quality employees. As a result of this discussion, Uni*Quality mailed Infotronx a letter along with two resumes.

Infotronx decided to hire Uni*Quality, and in August the two signed a contract for Uni*Quality to provide software development services for Infotronx. Under the contract, Uni*Quality provided software programmers to Infotronx and billed Infotronx for the programmers' time and for any software products Uni*Quality purchased for Infotronx. The contract was not limited to any particular time period. Between August 20, 1990 and March 31, 1991, Uni*Quality mailed weekly invoices to Infotronx.

Infotronx failed to pay most of the invoices. During August and September 1990, Infotronx paid Uni*Quality nothing. By October 11, 1990, Infotronx was far behind on its payments. On that day, O'Brien met with Kyle Hauser, an Infotronx financial officer. During the meeting, Hauser gave O'Brien the old line, "The check [—in this case for $25,000—] is in the mail." Hauser also told O'Brien that Infotronx would pay Uni*Quality $20,000 per week until the outstanding balance owed by Infotronx was paid.

Uni*Quality did receive a check for $25,000, dated October 12, 1990, through the mail. The next week, Infotronx mailed Uni*Quality another check for about $15,700. However, despite Hauser's promise, Uni*Quality received no regular weekly payments. Sometime later in October, Gruenwald met with Charles Baker and Randolph Reitz. During the meeting, Baker acknowledged that Infotronx owed Uni*Quality over $100,000. Baker told Gruenwald that Infotronx had good credit, and that it would pay Uni*Quality the balance in full within one week. Baker knew, however, that Infotronx would be unable to pay Uni*Quality in full for either its past or future services. The only reason Baker promised to pay Uni*Quality in full was to induce Uni*Quality to keep providing services in the future.

One week after another came and went without Uni*Quality receiving the payment Baker had promised. The weeks stretched into months, until finally, in December 1990, Gruenwald called Hauser to complain that Uni*Quality might not be able to pay the consultants working on the May project because Infotronx had not paid Uni*Quality. A short time later Wade Baker phoned Gruenwald to tell him that Infotronx liked Uni*Quality's work and wanted to continue to work with them. Wade Baker promised to send a check immediately for any balance outstanding for more than thirty days. True to form, however, Baker did

not send the check. Gruenwald decided a week later to visit Wade Baker personally. At that time, Baker gave Gruenwald a check for approximately half of what he had promised. Besides receiving this check, Gruenwald also received more promises. Baker told Gruenwald that if Uni*Quality would continue to provide its services, Infotronx would provide future work for Uni*Quality and would pay Uni*Quality a percentage of the revenue Infotronx received from the labor scheduling system if any of the payments owed Uni*Quality were not paid.

Based on Baker's promises to Gruenwald, Uni*Quality continued to provide services for Infotronx through February 1991. In January, May finally accepted the labor scheduling system. Although the May project apparently ended happily for Infotronx, Uni*Quality was not so fortunate. Despite all of Infotronx's promises, Infotronx has not paid any of the outstanding balance it owed Uni*Quality, despite numerous demands. Nor has Infotronx given Uni*Quality any more work or paid to Uni*Quality any of the revenue it received from the labor scheduling system. Finally becoming fed up with Infotronx's recalcitrance, Uni*Quality filed this suit.

The district court denied Infotronx's original motion to dismiss the RICO claim, which was based solely on the ground that Uni*Quality had failed to plead the alleged predicate acts of mail and wire fraud with the specificity required by Fed.R.Civ.P. 9(b). Infotronx then submitted a second motion based on both a lack of specificity under Rule 9(b) and on the complaint's failure to allege a pattern of racketeering activity. A day before Uni*Quality's response brief was due, the district court granted Infotronx's motion. In a terse order, the court stated that the complaint failed to set forth any acts of mail fraud, and that even if it did, those acts did not amount to a pattern of racketeering activity. Having dismissed the RICO claim, the only basis for federal jurisdiction in this case, the court dismissed Uni*Quality's state law claims without prejudice.

Uni*Quality filed a timely motion to alter or amend the district court's judgment and also requested leave to amend its complaint. In that motion, Uni*Quality set forth additional facts concerning fraud that Infotronx allegedly had perpetrated against other companies that had performed services for it. The motion also raised legal arguments explaining why Uni*Quality believed it had properly alleged a pattern of racketeering activity.

In an order somewhat longer and more detailed than its original order, the district court denied Uni*Quality's motion. The court first held that the acts set forth in the complaint, even as elucidated by the motion, did not constitute mail or wire fraud. The court went on to hold that even if the complaint did allege mail or wire fraud, it did not set forth a pattern of racketeering activity. The information about alleged fraud against other companies did not change things, according to the court, because that information was not specific enough to meet Rule 9(b)'s requirements.

## II.

Uni*Quality's theory of fraud is that Infotronx, not having enough money to complete the labor scheduling project for May, induced Uni*Quality and other companies to supply free (or cut-rate) services by falsely promising that it would pay in full for those services when it never had any intention of doing so. Thus, Infotronx fraudulently obtained the value of the services provided. The mailings and telephone conversations that turned this fraudulent scheme into mail and wire fraud included Uni*Quality's mailing of invoices and other information to Infotronx, the phone conversations in which Infotronx representatives assured Uni*Quality that payment was forthcoming, and even the mailing of checks for partial payment from Infotronx to Uni*Quality, which Uni*Quality says were intended to lull it into thinking that Infotronx really was going to eventually pay.

Infotronx says this was not fraud at all but, rather, just an imaginative lawyer's

attempt to recast a simple debt collection case as a violation of a federal criminal statute so that Uni*Quality may use RICO's treble damages provisions and the adverse consequences that come from charges of "racketeering" to bludgeon Infotronx and obtain a favorable settlement. Whether Infotronx is correct need not concern us because even if Uni*Quality has properly alleged violations of the federal mail and wire fraud statutes, it has not alleged that Infotronx engaged in a pattern of racketeering activity.

■ RICO defines a "pattern" as "requir[ing] at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5). But two racketeering acts, while necessary to make a pattern, are normally not sufficient. In *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 236–43, 109 S.Ct. 2893, 2898–2902, 106 L.Ed.2d 195 (1989), the Supreme Court held that besides showing a number of predicate acts, to establish a pattern a plaintiff must also show that those acts were related and continuous.

■ In this case, as in most civil RICO cases, the question before us is continuity. In *H.J.*, the Court described continuity as "both a closed-and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its very nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902. A plaintiff may demonstrate continuity over a closed period by "proving a series of related predicates over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902. A plaintiff may also demonstrate continuity by showing that the predicate acts demonstrate "a specific threat of repetition extending indefinitely into the future," or that the defendant's criminal activity is "a regular way of conducting defendant's ongoing legitimate business ...." *Id.* It is important to remember, however, that "Congress was concerned in RICO with longterm criminal conduct." *Id.* Thus, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy" RICO's continuity requirement. *Id.*

At least with regard to Infotronx's actions towards Uni*Quality, the allegations in Uni*Quality's complaint do not show the continuity necessary to establish a pattern of racketeering activity. Uni*Quality has alleged but one scheme that lasted at most seven to eight months. That scheme had a natural end point: the completion of the labor scheduling program for May. The only predicate acts alleged were mail and wire fraud. Uni*Quality was the scheme's only victim. This is precisely the type of short-term, closed-ended fraud that, subsequent to *H.J.*, this circuit consistently has held does not constitute a pattern. See, e.g., *J.D. Marshall Int'l v. Redstart, Inc.*, 935 F.2d 815, 820–21 (7th Cir.1991); *U.S. Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1266–69 (7th Cir.1990); *Olive Can Co., Inc. v. Martin*, 906 F.2d 1147, 1150–52 (7th Cir.1990).

On two grounds, Uni*Quality challenges the conclusion that its complaint did not state a pattern. First, it argues that the complaint alleged an open-ended scheme because the contract it signed with Infotronx was not limited to any particular time period. Therefore, the threat of fraud continued. However, the fact that the contract was not limited to a particular time period does not mean that Uni*Quality has alleged an open-ended scheme. The complaint itself alleges that after the labor scheduling project ended, Infotronx offered no more work to Uni*Quality, despite promises to do so. Indeed, Infotronx's false promise to give Uni*Quality more work was one of the misrepresentations that Uni*Quality trumpets to support its theory that Infotronx committed mail and wire fraud. The only reasonable inference from this is that when Infotronx got what it wanted from Uni*Quality—that is, free or cut-rate services in connection with the labor scheduling project—its scheme ended. This is entirely inconsistent with an assertion that Infotronx's scheme was open-ended.

■ Uni*Quality also argues that Infotronx defrauded several other companies in the same manner Infotronx defrauded Uni*Quality. According to Uni*Quality,

this raises the inference that fraud was the normal way that Infotronx conducted its business and therefore demonstrates that Infotronx engaged in a pattern of racketeering activity. The problem with this argument, however, is that the only allegations in the complaint concerning other companies are that Infotronx hired other companies and that "upon information and belief none of these companies has been paid in full...."

Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud ... shall be stated with particularity." While this does not require a plaintiff to plead facts that if true would show that the defendant's alleged misrepresentations were indeed false, it does require the plaintiff to state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir.1992) (citations omitted); *see also Graue Mill Dev. Co. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992–93 (7th Cir. 1991). In other words, the plaintiff must plead the "who, what, when, and where" of the alleged fraud. Uni*Quality's allegations of fraud against other companies are woefully deficient. They do not even mention any misrepresentations, much less any specifics about those misrepresentations. Uni*Quality's allegations do not come close to meeting Rule 9(b)'s particularity requirements.

Perhaps, though, Uni*Quality could have amended its complaint to meet Rule 9(b)'s requirements concerning the fraud against the other alleged victims. This brings us to Uni*Quality's argument that the district court abused its discretion by refusing to allow Uni*Quality to amend its complaint. In its motion to amend, Uni*Quality cited some additional facts concerning Infotronx's alleged fraud against three other companies that it says would be sufficient to meet Rule 9(b)'s particularity requirement. Uni*Quality stated that a company called AGS had sued Infotronx for $40,000. AGS had mailed invoices to Infotronx from September 1990 through January 1991, and had received letters and phone calls from Infotronx concerning Infotronx's assurances of payment and failure to pay. Uni*Quality's motion also alleged that a company called IMI had mailed invoices to Infotronx, and had been involved in "repeated" phone conversations concerning Infotronx's failure to pay. "Upon information and belief," Uni*Quality stated that many of these phone conversations involved assurances by Infotronx that it would pay IMI. Finally, Uni*Quality stated in its motion that a company called Oracle had sent invoices to Infotronx but had not been paid. Uni*Quality also noted more generally that it "believe[d] that the scenario with regard to [Uni*Quality] ... was typical as to other victims," and that "[u]pon information and belief, [Infotronx] promised companies which retained its services that they would perform within a budgeted amount."

These allegations add little if anything to the allegations in the complaint. It is true that where a plaintiff is alleging fraud against a third party, less detail may be required under Rule 9(b) because the plaintiff may not have access to all the facts necessary to detail his claim. See *Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir.1972) (citing 5 Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 1298, at 413 (1969)); *FSLIC v. Shearson–American Express*, 658 F.Supp. 1331, 1337 (D. Puerto Rico 1987); 2A James W. Moore & Jo Desha Lucas, *Moore's Federal Practice* ¶ 9.03[1], at 9–29 (2d ed. 1991). However, even under a more relaxed standard, Uni*Quality's allegations are insufficient. The allegations concerning Oracle, for instance, amount to nothing more than an allegation that Infotronx never paid Oracle.

The allegations concerning AGS and IMI are slightly more detailed, but not nearly detailed enough. While those allegations state the general subject matter of the alleged misrepresentations (false promises to pay), they do not even hint at the identity of those who made the misrepre-

sentations, the time the misrepresentations were made, or the places at which the misrepresentations were made. The allegation concerning promises to pay IMI was made "[u]pon information and belief." However, allegations made upon information and belief are insufficient, even if the facts are inaccessible to the plaintiff, unless the plaintiff states the grounds for his suspicions, something Uni*Quality has not done. *Old Republic*, 959 F.2d at 684. Finally, there appears to be no reason why Uni*Quality could not have provided more detail about AGS, since AGS's lawsuit against Infotronx is a matter of public record.

Rule 9(b)'s particularity requirement serves an important purpose. Accusations of fraud can seriously harm a business. This is especially so in RICO cases where those accusations of fraud lead to the probably more damaging accusation that the business engaged in "racketeering." Rule 9(b) ensures that a plaintiff have some basis for his accusations of fraud before making those accusations and thus discourages people from including such accusations in complaints simply to gain leverage for settlement or for other ulterior purposes. See *id.* at 683. It would disserve this purpose to allow Uni*Quality to maintain its RICO claim, premised on Infotronx's alleged fraud, based on accusations as flimsy as those in its complaint and motion to amend.

Uni*Quality finally argues that the district court should not have dismissed the complaint before receiving Uni*Quality's response to Infotronx's motion to dismiss. We agree, but in this case do not think that is grounds for reversal. Uni*Quality filed a detailed motion to amend the judgment and for leave to amend its complaint. The district court carefully considered that motion before denying it. On appeal, Uni*Quality has not pointed to anything additional that it could include in its complaint so that the complaint would comply with Rule 9(b).

Uni*Quality has had ample opportunity to make its arguments both in the district court and this court. In these circumstances, any error the district court might have committed in precipitously dismissing the complaint was harmless. See Fed. R.Civ.P. 61.

For the above reasons, the district court's judgment is

AFFIRMED.