**HARRIS TRUST AND SAVINGS BANK,** not individually but solely as Trustee for the Ameritech Pension Trust; Ameritech Corporation; and John A. Edwardson, Plaintiffs,

v.

**SALOMON BROTHERS, INC. and Salomon Brothers Realty Corp., Defendants.**

**No. 92 C 5883.**

United States District Court, N.D. Illinois, E.D.

Dec. 24, 1992.

---

Charles Clark Jackson, Stanley Anthony Walton, III, Krista Jean Schoenheider, Seyfarth, Shaw, Fairweather & Geraldson,

Warren A. Von Schleicher, Mayer, Brown & Platt, Chicago, IL, for plaintiffs.

Peter C. Hein, Andrew C. Houston, George T. Conway III, Claire D. Chappell, Wachtell, Lipton, Rosen & Katz, New York City, William F. Conlon, Richard B. Kapnick, Thomas K. Cauley, Jr., Sidley & Austin, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Harris Trust, as trustee for Ameritech Pension Trust ("APT"), Ameritech Corporation ("Ameritech") and John A. Edwardson (collectively "plaintiffs") bring this ten-count complaint against Salomon Brothers Inc. and Salomon Brothers Realty Corporation (collectively "Salomon") alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, violations of various provisions of the Employee Retirement Income Security Act ("ERISA"), and several state law claims. Salomon now moves to dismiss APT's complaint in its entirety for failure to state a claim. For the reasons set forth below, we deny the motion in part and grant it in part.

### I. Standard of Review

In considering a motion to dismiss, the court accepts the factual allegations of the complaint as true. *See Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) (per curiam) (citing *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). Furthermore, unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief," a court should not grant a motion to dismiss. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Accordingly, the court views the well-pleaded complaint's allegations, as well as reasonable inferences therefrom, in the light most favorable to the plaintiff. *See Balabanos v. North Am. Invest. Group, Ltd.*, 708 F.Supp. 1488, 1491 n. 1 (N.D.Ill.1988) (citing *Ellsworth v. City of Racine*, 774 F.2d 182, 184 (7th Cir.1985),

cert. denied, *475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986).*

## II. Factual Background

Ameritech's Asset Management Committee has had general authority for managing assets of the company's pension plan and for appointing investment managers to manage its assets. For the relevant time periods, Ameritech appointed National Investment Services of America, Inc. ("NISA") to manage APT's Dedicated Portfolio. In addition, since 1984, Salomon had acted as a broker-dealer and investment advisor to APT in numerous financial transactions. Beginning in the fall of 1986 and through 1987, Salomon recommended a number of investments for APT's Dedicated Portfolio.

### A. *Fee Agreement I*

In July, 1987, Motels of America, Inc. ("MOA") purchased certain properties pursuant to financing set up by Salomon involving the issuance of mortgage notes ("Portfolio I"). At the closing of these acquisitions, Salomon received fee participation rights in Portfolio I ("Fee Agreement I"). Under Fee Agreement I, Salomon would receive certain rights of participation in Portfolio I's net cash flow, sale or refinancing proceeds, and property appreciation. These fees were only payable after MOA satisfied obligations to mortgage noteholders.

In October, 1987, Salomon offered to sell APT its interest in Fee Agreement I. Prior to this transaction, and each of the four relevant transactions between Salomon and APT, Salomon provided APT with a confidential offering memorandum and a copy of the fee agreement and assignment.[1] The offering memoranda contained appraisals and projections of fees payable under the fee agreements. APT alleges that the memoranda did not contain any meaningful analysis of the risks involved in the purchase of an interest in the fee agreements, nor were the projections accurate. On October 28, 1987, APT purchased 95% of Salomon's interest in Fee Agreement I. Salomon retained a 5% interest for the purpose

of monitoring the investment performance of MOA on behalf of APT.

### B. *Fee Agreement II*

In March 1988, MOA acquired some additional properties pursuant to a financing plan put together by Salomon involving the issuance of mortgage notes ("Portfolio II"). At the closing of Portfolio II, Salomon and MOA entered into a fee agreement similar to Fee Agreement I ("Fee Agreement II"). Salomon approached APT to purchase an interest in Fee Agreement II. On April 28, 1988, APT purchased 100% of Salomon's interest in Fee Agreement II.

### C. *Fee Agreement III*

In August, 1989, MOA acquired still more properties pursuant to another financing plan devised by Salomon involving the issuance of mortgage notes ("Portfolio III"). MOA and Salomon entered into another fee agreement ("Fee Agreement III"). In the fall of 1989, Salomon approached APT about purchasing an interest in Fee Agreement III. The offering memorandum Salomon furnished APT, however, failed to disclose that since July 1989, the financial performance of Portfolio III had been deteriorating and MOA management was concerned that Portfolio III would not perform as projected in the memorandum. Through December, Salomon continued to have conversations with MOA regarding Portfolio III's adverse developments. That month, Salomon learned from MOA that the Portfolio III market had been misread, that costs were higher than projected, that Portfolio III would not meet its projections, and that no distributions would be made under Fee Agreement III. Salomon did not pass any of this information along to APT.

While APT was considering investing in Fee Agreement III, APT and NISA noticed that payments under Fee Agreement I were lagging behind Salomon's projections. Salomon reassured them that the investment remained sound and that the delayed payments were due to a mix up resulting from changes in MOA's accounting staff. In December, however, Salomon had a

---

**1.** There is one exception. With respect to Fee Agreement IV, Salomon did not furnish APT with an offering memorandum.

meeting with MOA and learned that it was unclear whether any further distributions would be made under Fee Agreements I and II. Salomon did not pass this information along to APT.

In December 1989, APT purchased 95% of Salomon's interest in Fee Agreement III, while Salomon retained 5% in order to monitor MOA's performance.

### D. *Fee Agreement IV*

Finally, in October 1989, Best Inns, Inc. ("Best") acquired nine hotels pursuant to a financing plan set up by Salomon involving the issuance of mortgage notes ("Portfolio IV"). At the closing, Best and Salomon entered into a fee agreement ("Fee Agreement IV"). On December 22, 1989, the same day APT purchased its interest in Fee Agreement III, it purchased a 95% interest of Salomon's rights in Fee Agreement IV. Again, Salomon retained a 5% monitoring interest.

After APT purchased 95% of Salomon's interest in Fee Agreements III and IV, Salomon continued to receive bad news about Portfolios I, II, and III. On December 26, 1989, MOA informed Salomon that Portfolio III would need to be restructured to succeed. During the first quarter, MOA kept Salomon apprised of the deteriorating condition of the three portfolios. In April, 1990, an MOA executive informed Salomon that Portfolio III probably could not meet its obligations to mortgage noteholders. Salomon never advised APT of these developments.

In September, 1990, MOA defaulted on the Portfolio III mortgage notes, and in December, the company filed for bankruptcy under Chapter 11.

### III. Discussion

Plaintiffs have brought this action alleging that Salomon breached its fiduciary duties to APT and is liable under RICO for multiple acts of fraud.

### A. *ERISA*

#### 1. Counts I and III

■ Salomon seeks to dismiss Counts I and III on the grounds that Salomon was not a fiduciary under ERISA. Plaintiffs contend, among other theories, that Salomon was a fiduciary because, under 29 U.S.C. § 1002(21)(A)(ii), the brokerage firm acted as an investment advisor to APT.

ERISA provides that "a person is a fiduciary with respect to a plan to the extent ... (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." 29 U.S.C. § 1002(21)(A)(ii). Under Department of Labor regulations,

[a] person shall be deemed to be rendering 'investment advice' to an employee benefit plan within the meaning of [29 U.S.C. § 1002(21)(A)(ii) ] only if:

(i) such person renders advice to the plan as to the value of securities or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property; and

(ii) such person directly or indirectly ...

(B) renders any advice ... on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan ... that such services will serve as a primary basis for investment decisions ... and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3–21(c)(1).

Plaintiffs have sufficiently alleged that Salomon was an investment advisor fiduciary under 29 C.F.R. § 2510.3–21(c)(1)(ii)(B). Plaintiffs have charged that over the course of several years, Salomon "advocated real estate and other investments to APT which they considered appropriate for APT's Dedicated Portfolio." Cmplt. at ¶ 13. Plaintiffs have further alleged that "Salomon knew and understood that APT relied on deal-specific information, research, analysis and opinions generated by Salomon," and that the primary basis of

APT's decisions to purchase Salomon's interests in the various fee agreements was Salomon's advocacy of the deal. Cmplt. at ¶¶ 18, 22, 29 and 33. As for compensation, plaintiffs have charged that in three of the four fee agreement transactions, Salomon retained a 5% interest in the fee agreement for the purpose of monitoring and scrutinizing the investment performance on behalf of APT. Although plaintiffs do not assert in the Complaint that the 5% retained interest constituted compensation for Salomon, they make that assertion in their brief. At the very least, then, drawing reasonable inferences in favor of the non-movant plaintiffs, there is a fact issue regarding whether or not Salomon was compensated for the investment advice at issue here. Putting all of plaintiffs' allegations together, we find that it does not appear beyond doubt that the plaintiff can prove no set of facts entitling him to relief.[2] Accordingly, we deny Salomon's motion to dismiss Counts I and III.

### 2. Count II

■ Regardless of whether Salomon is found to be a fiduciary, Count II states that "[i]f it is ever found that other fiduciaries with respect to the Plan may have breached their fiduciary duties, Salomon and Salomon Realty conspired against APT and knowingly participated in and facilitated such violations...." Cmplt. at ¶ 64. By neglecting to describe a particular breach by a particular fiduciary, Count II never progresses beyond the hypothetical and fails to state a claim. *See Ottawa Dental Laboratory, Inc. v. Employers Benefit Trust*, 1990 WL 119559 at *4, 1990 U.S.LEXIS 10518 at *8 (N.D.Ill. Aug. 14, 1990); *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 535 & 541 (7th Cir.1991). Accordingly, we dismiss Count II of the Complaint.

### B. *RICO*

■ Salomon seeks to dismiss all of the RICO counts[3] for failure to allege a RICO

pattern. Defendants contend that the pattern of activity cited by the plaintiffs is actually predicated upon a single purchase and a single victim and, as such, fails to meet RICO requirements. APT asserts that Salomon's deceptive activity occurred over a long period of time and affected multiple victims—namely the retired participants in the pension plan. We agree with Salomon that APT's allegations do not amount to a pattern of racketeering activity.

In order to establish a pattern of racketeering activity, a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) (emphasis in original). Here, Salomon does not contest the relatedness of the acts, instead it contends that plaintiffs have failed to allege sufficient continuity to establish a pattern.

In *H.J., Inc.*, the Court explained that " '[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.*, 492 U.S. at 253, 109 S.Ct. at 2902. In an effort to clarify its meaning, the Court stated that

> [p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.

*Id.*

The Seventh Circuit has further elucidated those factors which should guide a court in determining whether a party has established the requisite ·continuity. These factors include " 'the number and variety of predicate acts and the length of time over which they were committed, the number of

---

**2.** Although it is not beyond doubt that plaintiffs may be able to establish a fiduciary relationship, that is not to say that they have a particularly strong case. It behooves both parties to take this opportunity to attempt to negotiate a settlement reflecting these realities.

**3.** Counts IV, V, VI, and VII allege violations of 18 U.S.C. §§ 1962(a), (c), and (d).

victims, the presence of separate schemes and the occurrence of distinct injuries.'" *J.D. Marshall International, Inc. v. Redstart, Inc.*, 935 F.2d 815, 820 (7th Cir.1991) (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986)).

Here, plaintiffs have essentially charged only one scheme lasting, at most, just over one year. That is, although Salomon allegedly misrepresented developments in Portfolios I and II in addition to Portfolio III, the end purpose of all of the deception was to induce APT to purchase Salomon's interest in Fee Agreements III and IV.[4] *See Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918 (7th Cir.1992) (although defendant company used the mails and telephone to repeatedly misrepresent its intention to pay the plaintiff under a contract not limited to a particular time period in order to complete a single project, the Seventh Circuit held that plaintiff had alleged but one scheme with a natural end point); *Koulouris v. Estate of Chalmers*, 790 F.Supp. 1372 (N.D.Ill.1992) (court found that two predicate acts of misrepresentation over a period of twenty-one months, together aimed at inducing plaintiff to buy a certain stock, did not allege a pattern, but a single scheme inflicting one distinct injury on one plaintiff). The scheme ended, as it had to, with MOA's declaration of bankruptcy. In this circuit, allegations of multiple racketeering acts committed in the perpetration of one scheme over the period of a year do not satisfy RICO requirements. *See Uni\*Quality, Inc. v. Infotronx*, 974 F.2d at 922 (holding that allegations of racketeering activities over the course of seven to eight months involving one scheme were not sufficient to show a pattern); *Koulouris v. Estate of Chalmers*, 790 F.Supp. 1372 (allegations of racketeering activity which took place over the course of 21 months to perpetrate one scheme not sufficient to establish requisite pattern). Accordingly, we dismiss Counts IV, V, VI, and VII.

### C. *State–Law Claims*

Because Counts I and III, both federal ERISA claims, will proceed, we need not dismiss plaintiffs' state-law claims for lack of subject-matter jurisdiction. Accordingly, Salomon's motion to dismiss Counts VIII through X is denied.

### IV. Conclusion

For the foregoing reasons, we grant defendants' motion to dismiss Counts II, IV, V, VI, and VII of the Complaint and deny their motion to dismiss Counts I, III, VIII, IX, and X. It is so ordered.

---

**4.** The framing of the Complaint supports this view of the events. In counts IV, V, VI, and VII, plaintiffs only seek damages relating to Fee Agreement III.