**HARRIS TRUST AND SAVINGS BANK, not individually but solely as Trustee for the Ameritech Pension Trust; Ameritech Corporation; and John A. Edwardson, Plaintiffs,**

v.

**SALOMON BROTHERS, INC. and Salomon Brothers Realty Corp., Defendants.**

**No. 92 C 5883.**

United States District Court, N.D. Illinois, E.D.

Aug. 16, 1993.

Charles Clark Jackson, Stanley Anthony Walton, III, Krista Jean Schoenheider, Seyfarth, Shaw, Fairweather & Geraldson, Warren A. Von Schleicher, Mayer, Brown & Platt, Chicago, IL, for plaintiffs.

William Conlon, Sidley & Austin, Chicago, IL, George T. Conway, III, Wachtell, Lipton, Rosen & Katz, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Harris Trust, as Trustee for Ameritech Pension Trust ("APT"), Ameritech Corporation, and John A. Edwardson (collectively "plaintiffs") have filed their second amended complaint ("amended complaint") against Salomon Brothers, Inc. and Salomon Brothers Realty Corporation (collectively "Salomon") alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, violations of various provisions of the Employee Retirement Income Security Act ("ERISA"), and several state law claims. In its answer to the amended complaint, Salomon filed two counterclaims, alleging that if it is liable for any breaches of duty, then Ameritech is also liable, and must contribute to any damages awarded. Having previously dismissed plaintiffs' earlier complaint, we now address Salomon's motion to dismiss APT's amended complaint and plaintiffs' motion to dismiss Salomon's counterclaims. For the reasons set forth below, we deny Salomon's motion to dismiss Count III of the amended complaint, grant its motion to dismiss Counts IV through VII, XI, and XII of the amended complaint, and deny plaintiffs' motion to dismiss the counterclaims.

## I. Factual Background [1]

To avoid needless and lengthy replication, we will assume familiarity with the facts of this case as laid out in our prior opinion dismissing APT's original complaint. *See Harris Trust and Savings Bank v. Salomon Brothers, Inc.,* 813 F.Supp. 1340 (N.D.Ill. 1992) ("*Harris I*"). However, we highlight here a few relevant facts set forth in the amended complaint.

Having already arranged financing for Motels of America ("MOA") to proceed with various acquisitions (Portfolios I and II), in the fall of 1989 Salomon devised yet another plan involving the issuance of mortgage notes to help MOA purchase still more properties ("Portfolio III"). In this instance, however, Salomon sent out an offering memorandum to prospective noteholders riddled with inaccuracies and misrepresentation. The offering memorandum, sent to noteholders sometime after August 1, 1989, and to APT in October, 1989, failed to disclose that since July, 1989, the financial performance of Portfolio III had been deteriorating, and MOA management was concerned that it would not perform as projected in the memorandum. Amended Complaint at ¶ 35.

At about the same time, Salomon was looking to sell its interest in another fee agreement. In October of 1988, Best Inns, Inc. ("Best") acquired nine hotels pursuant to a financing plan set up by Salomon ("Portfolio IV"). At the closing, Best and Salomon entered into a fee agreement ("Fee Agreement IV"). Although plaintiffs aver that soon after the deal closed, Salomon began looking for a buyer of its interest, it did not approach APT about a possible sale until the fall of 1989.

On December 20, 1989, Salomon sent a fax to APT endorsing both Fee Agreements III and IV, stating that "[b]ased on our knowledge of the deals we believe it is highly likely that the terms will go beyond five years and returns realized will be considerably greater than 20%." Furthermore, sometime shortly before or after APT's purchase of Fee Agreement IV, Salomon sent NISA a copy of its 1988 offering memorandum, allegedly highly inaccurate as of December 1989. On December 22, 1989, the same day APT purchased its interest in Fee Agreement III, it purchased a 95% interest of Salomon's rights

---

1. We will, of course, take all well-pleaded allegations as well as reasonable inferences therefrom in the light most favorable to the plaintiff. *See Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986).

in Fee Agreement IV. Salomon retained a 5% monitoring interest.

## II. Discussion

### A. Salomon's Motion to Dismiss the Amended Complaint

Salomon seeks to dismiss various counts of plaintiffs' amended complaint, including its claim for knowing participation in an ERISA breach, its RICO claims, and two state law claims.

### 1. ERISA Claim

■ Salomon seeks to dismiss Count III of plaintiffs' amended complaint, which alleges that Salomon knowingly participated in a fiduciary's breach of duties. The claim rests on the premise that an action for knowing participation may lie against a nonfiduciary, and thus may lie against Salomon in the event Salomon is not found to be a fiduciary under ERISA.

Salomon argues that the Supreme Court's recent decision in *Mertens v. Hewitt Associates*, —— U.S. ——, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), eviscerates APT's claim by holding that ERISA does not authorize suits for money damages against nonfiduciaries who knowingly participate in a breach of fiduciary duties. APT disputes Salomon's reading of *Mertens*, contending that although the Supreme Court interpreted ERISA to prevent recovery of money damages from nonfiduciaries, it expressly allowed plaintiffs to recover restitution and other equitable relief. Asserting that it seeks restitution, not compensatory damages, APT maintains that *Mertens* does not bar its claim.

We agree with plaintiffs that *Mertens* does not prevent a plaintiff from seeking restitution or other equitable relief from a nonfiduciary. *See Mertens*, —— U.S. ——, 113 S.Ct. at 2072 (Summing up the majority's holding, dissent observes that "[a]lthough it is assumed that a cause of action against a third party such as respondent is provided by ERISA, the remedies available are limited to the 'traditional' equitable remedies, such as injunction and restitution, and do not include compensatory damages."). The question, then, is whether the relief APT seeks for Count III constitutes restitution, or is simply a well-crafted plea for money damages.

■ In *Mertens*, the Supreme Court observed that "the 'equitable relief' awardable under § 502(a)(5) includes restitution of ill-gotten plan assets or profits." *Mertens*, —— U.S. at ——, 113 S.Ct. at 2070. As this statement reveals, restitution is appropriate where a defendant unjustly enriches himself at the expense of another. *See also* Restatement of Restitution § 1. Moreover, it is clear that restitution may take the form of money.

■ Here, the plaintiffs seek to recover the money they invested in Fee Agreements I through IV (i.e. the purchase prices of the agreements), arguing that they were fraudulently induced to enter into the transactions. They also ask that Salomon be required to disgorge any profits it made through the use of APT's assets. Unlike a request for damages due to a breach of contract, an action for restitution seeks to put a plaintiff back in his original position. Similarly, a person who has been fraudulently induced to pay money to another and who does not obtain what he expected in return, is entitled to restitution. Restatement of Restitution § 28.

By their first request, plaintiffs are attempting to be put back in the position they would have been in had there been no transaction. By their second, they seek to have defendants turn over any unjust profits gained. Both pleas constitute requests for restitution. *See Rogers v. Loether*, 467 F.2d 1110, 1121–22 (7th Cir.1972), *aff'd.* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1972) (Court approvingly quoted Professor Moore's statement that '[i]n equity, restitution is usually thought of as a remedy by which defendant is made to disgorge illgotten gains or to restore the status quo, or to accomplish both objectives.'). Accordingly, we deny Salomon's motion to dismiss Count III.

### 2. RICO Claims

Next, Salomon seeks to dismiss Counts IV through VII, alleging various RICO violations. As a threshold matter, Salomon charges that all the RICO counts should be dismissed for failing to adequately allege a pattern, as required under §§ 1962(a), (c), and (d). Having previously discharged plain-

tiffs' RICO claims for failure to allege a pattern, we now review the amended complaint to determine whether APT's changes prevent another dismissal.

### a. Pattern

 In order to state a RICO claim under § 1962(a), (c), or (d), a plaintiff must allege a pattern of racketeering activity. 18 U.S.C. §§ 1962(a), (c) and (d). *See also Morgan v. Bank of Waukegan,* 804 F.2d 970 (7th Cir.1986) (both § 1962(a) and (c) require plaintiff to show a pattern of racketeering activity). In order to establish a pattern, a plaintiff "must show that the racketeering predicates are related *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) (emphasis in the original). The Supreme Court has explained that "continuity" is "both a closed-and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* 492 U.S. at 243, 109 S.Ct. at 2902. This case presents an alleged closed-ended scheme.

In determining whether a closed-ended scheme is continuous, within the meaning of RICO, the Seventh Circuit instructs courts to consider "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986). In *Harris I,* we dismissed plaintiff's RICO claims, finding that at bottom "the end purpose of all of the [alleged] deception was to induce APT to purchase Salomon's interest in Fee Agreements III and IV." *Harris I,* 813 F.Supp. at 1345. That single scheme, with its lone victim and limited duration, fell short of the requisite pattern. Plaintiffs are now back, alleging multiple schemes that stretched over years, affected multiple victims, and caused several distinct injuries.

### (i) Multiple Schemes

In the amended complaint, plaintiffs rely on essentially the same set of facts contained in their earlier complaint. This time, however, they parse their allegations into three separate schemes, instead of one. Now, in addition to a scheme involving the sale of Fee Agreement III, plaintiffs aver that Salomon engaged in two further schemes: a scheme to fraudulently induce investors (other than APT) to purchase mortgage notes in Portfolio III, and a scheme to dump Fee Agreement IV on APT.

### (a) Mortgage Note Scheme

 Plaintiffs allege that Salomon's sale of mortgage notes to finance MOA's purchase of the Cricket Hotels constituted a scheme separate and distinct from its sale of Fee Agreement III to APT. On the surface, this portrayal of events has some appeal. The two "schemes" involved different victims (the mortgage noteholders on one hand, and APT on the other), and different transactions. However, single schemes often involve multiple transactions. Accordingly, although plaintiffs may well have alleged a *broader* scheme to profit from MOA's purchase of Cricket Hotels, they have not alleged an *additional* scheme.[2] That is, the sale of mortgage notes in the fall of 1989 and the sale of Fee Agreement III during the same time period, both of which involved the same deceptive offering memorandum and misrepresentations, are sufficiently interrelated to direct the conclusion that they comprised part of a single scheme to profit from MOA's purchase of Cricket, rather than two distinct schemes.

### (b) Fee Agreement IV

 Next, plaintiffs aver that Salomon's dumping of Fee Agreement IV on APT qualifies as a scheme distinct from its sale of Fee Agreement III. While this transaction involved the same victim (APT), plaintiffs contend that it inflicted a distinct injury, and that it involved fresh misrepresentations and the sale of different assets. Again, we are

---

2. "Scheme," of course, is a difficult term to define. As the *H.J.* Court put it: "A 'scheme' is in the eye of the beholder, since whether a

scheme exists depends on the level of generality at which criminal activity is viewed." *H.J.,* 492 U.S. at 241 n. 3, 109 S.Ct. at 2901 n. 3

faced with the tricky task of determining what constitutes a "scheme."

Looking beyond the superficial distinctions between the alleged dumping of Fee Agreements III and IV, one finds that the sale of Fee Agreement IV did not constitute a discrete scheme, but was simply an afterthought folded into Salomon's sales pitch regarding Fee Agreement III. Indeed, the fact that the December 20, 1989 fax discussed both Fee Agreements III and IV corroborates the view that there was only one "scheme" going on. Finally, other than seeking separate damages for Fee Agreement IV in the amended complaint, something they failed to do in their earlier foray, plaintiffs have alleged no new facts directing us to find two schemes where we previously found only one.

### (ii) Duration

■ Even if we determine that plaintiffs have alleged at least two distinct schemes, in order to find continuity, "the 'predicate acts' must 'extend[ ] over a substantial period of time'; 'a few weeks or months' is considered insubstantial." *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir.1992) (quoting *H.J.*, 492 U.S. at 241–44, 109 S.Ct. at 2902). That is, without allegations that the multiple schemes lasted a "substantial amount of time," a court will be reluctant to conclude that they pose a threat of continued criminal activity. *H.J.*, 492 U.S. at 241–44, 109 S.Ct. at 2902.

■ We calculate the length of Salomon's alleged "scheme" or "schemes" without factoring in any cover-up or preparation activity. *See, e.g., Midwest Grinding Co.*, 976 F.2d at 1024 ("even if we assume actions to hide Spitz's involvement with U.S. Grinding qualify as predicate acts, they do nothing to extend the *duration* of the underlying diversion scheme") (emphasis in the original); *West Coast Video Enterprises, Inc. v. Ponce De Leon*, 1991 WL 18427 1991 U.S.Dist. LEXIS 1207 (N.D.Ill. Feb. 1, 1991) (same); *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 85, 116 L.Ed.2d 57 (1991). This is a sensible approach, since cover-up and preparation activities, inevitable parts of any illicit operation, do not create a threat of extending a crime beyond its original scope, and are therefore not relevant to continuity. Accordingly, we gauge the length of the alleged scheme (or schemes) by measuring the duration of the relevant deceptive activity.

■ Plaintiffs contend that the Fee Agreement IV scheme began in the fall of 1988, when Salomon allegedly began searching for a buyer, and that it extended past December, 1989, since Salomon retained a 5% monitoring interest and continued to cover its misdeeds. Neither Salomon's alleged searching for a buyer nor its efforts to prevent discovery of any wrongdoing, however, can serve to stretch the life of the Fee Agreement IV scheme. Instead, the deception revolved around Salomon's transmission of allegedly false and misleading information to APT, first through a fax on December 20, 1989, and then through an inaccurate offering memorandum sent sometime in late December, 1989. Similarly, despite plaintiffs' efforts to portray the Portfolio and Fee Agreement III scheme as lasting more than a year, they have alleged no facts establishing any deceptive behavior prior to August 1, 1989. Instead, as the amended complaint makes clear, Salomon did not send misleading or false information to either the noteholders or APT until after August 1, 1989. *See* Amended Complaint at ¶ 35. Like the sale of Fee Agreement IV, Fee Agreement III closed on December 22, 1989—just four months after the alleged deception began. Accordingly, the core deceptive activities connected to all of the possible schemes spanned, at most, only four months.

Four months, however, is not "a substantial period of time," and does not support a claim that Salomon was engaged in the sort of long-term criminal conduct targeted by RICO. Thus, plaintiffs, again, have failed to allege a RICO pattern, and we dismiss Counts IV through VII.

### 3. Breach of Contract Claim

Next, Salomon seeks to dismiss Count XI, which alleges a state law claim for breach of contract. Salomon charges that APT failed to identify any breach, a necessary element under both Illinois and New York law. *See People ex rel. Hartigan v. E & E Hauling,*

*Inc.*, 218 Ill.App.3d 28, 47, 160 Ill.Dec. 691, 705, 577 N.E.2d 1262, 1276 (1st Dist.1991), 160 Ill.Dec. 691, *aff'd in part and rev'd. on other grounds*, 153 Ill.2d 473, 180 Ill.Dec. 271, 607 N.E.2d 165 (1992) ("A complaint for breach of contract must allege the existence of a contract between plaintiffs and defendants, performance by plaintiffs of the conditions imposed on them by the contract, breach of the contract by defendants, and the existence of damages as a result of the breach."). *See also Zaro Licensing, Inc. v. Cinmar Inc.*, 779 F.Supp. 276, 286 (S.D.N.Y. 1991) ("[S]uch a pleading must, at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain simple fashion.").

■ In their amended complaint, plaintiffs allege that Salomon made false warranties and representations in Fee Agreements III and IV, thereby breaching those contractual provisions.[3] Salomon correctly points out that plaintiffs neglect to identify what was false about the warranties listed. In response, plaintiffs assert that Salomon breached the covenant of good faith and fair dealing, which is implied in every contract in both Illinois and New York. *See Chemical Bank v. Paul*, 244 Ill.App.3d 772, 614 N.E.2d 436, 185 Ill.Dec. 302 (1st Dist.1993); *Gallagher v. Lambert*, 74 N.Y.2d 562, 549 N.E.2d 136, 549 N.Y.S.2d 945 (N.Y.1989).

A brief review of Illinois law suggests that while a covenant of good faith and fair dealing is implied in every contract, it generally arises "in the context of imposing a limitation on the exercise of discretion vested in one of the parties to a contract." *Carlson v. Carlson*, 147 Ill.App.3d 610, 498 N.E.2d 708, 711, 101 Ill.Dec. 384, 387 (2nd Dist.1986). *See also Sinclair v. State Bank of Jerseyville*, 207 Ill.App.3d 430, 566 N.E.2d 44, 47, 152 Ill.Dec. 516, 519 (4th Dist.1991) (the implied covenant requires a contracting party vested with discretion to exercise that discretion

reasonably); *Capital Options Invest. Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 189–90 (7th Cir.1992); *Bane v. Ferguson*, 707 F.Supp. 988, 994 (N.D.Ill.1989), *aff'd*, 890 F.2d 11 (7th Cir.1991). Stating a claim for breach of an implied covenant of good faith and fair dealing, then, differs from setting out a typical breach of contract claim, and requires allegations not contained in Count XI as it presently stands. Moreover, it is doubtful that the facts of this case warrant a claim for breach of the implied covenant since plaintiffs' grievance more closely resembles a garden variety fraud claim. Accordingly, we dismiss Count XI.

### 4. Unjust Enrichment Claim

■ In Count XII, plaintiffs attempt to set forth a claim for unjust enrichment. Like the plaintiffs in *Charles Hester Enterprises, Inc. v. Illinois Founders Ins. Co.*, 137 Ill.App.3d 84, 90–91, 484 N.E.2d 349, 354, 91 Ill.Dec. 790, 795 (5th Dist.1985), *aff'd*, 114 Ill.2d 278, 499 N.E.2d 1319, 102 Ill.Dec. 306 (1986), however, plaintiffs here appear to misunderstand the meaning of the term "unjust enrichment." As the court stated in *Charles Hester*,

> [t]he term 'unjust enrichment' is not descriptive of conduct that, standing alone, will justify an action for recovery. Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress or undue influence, and may be redressed by a cause of action based upon that improper conduct.

*Id.* Thus, plaintiffs cannot bring an action based on unjust enrichment, but "if defendants [have] unjustly enriched themselves by fraud or by a breach of a fiduciary relationship, then plaintiffs [can] seek redress by a constructive trust or other theory of action." *Id.*, citing, *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 328, 371 N.E.2d 634,

---

3. The representations and warranties allegedly breached read as follows:

 3. *Representations and Warranties of Assignor.* The Assignor represents and warrants to and agrees with the Assignee as follows:

 (a) The copy of the Agreement attached hereto as Exhibit A is a true, correct, and complete copy of the Agreement. The Assignor has neither

amended, modified or terminated the Agreement, nor assigned or otherwise transferred any of its rights under the Agreement except pursuant to this Assignment.

 (b) This Assignment has been duly authorized, executed and delivered by the Assignor.

 (c) To the best of the Assignor's knowledge, there is no default under the Agreement.

638, 13 Ill.Dec. 699, 703 (1977) (court stated that "[i]n equity a constructive trust may be imposed to redress unjust enrichment where there is either actual fraud or implied fraud resulting from fiduciary relationship"). We therefore dismiss Count XII for failure to state a claim.

### B. Salomon's Counterclaims

In its counterclaims, Salomon alleges that if it is liable to APT for any breach of duty (Count I) or for any transactions which violated § 406 of ERISA (Count II), then it has a right of contribution against Ameritech, a plan fiduciary, because Ameritech similarly must have breached its duties to APT. Plaintiffs have moved to dismiss both of Salomon's counterclaims, arguing that there is no right of contribution under ERISA, and even if there is, Ameritech escapes liability for one of two reasons: (1) ERISA § 405(d)(1) absolves trustees of liability for the acts and omissions of an appointed investment manager, and (2) trust law principles bar recovery by defendants who are more liable than their co-fiduciaries.

### 1. Right of Contribution

The Supreme Court has yet to rule definitively on whether ERISA permits contribution among co-fiduciaries. The Seventh Circuit, however, has ruled that a right of contribution exists under ERISA. *See Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449, 464 (7th Cir.1991) ("a non-settling defendant does possess a right of contribution under ERISA"), *citing Donovan v. Robbins*, 752 F.2d 1170, 1178 (7th Cir.1985).[4] *See also Anderson v. Rockford Products Corp.*, 1992 WL 390781 1992 U.S.Dist. LEXIS 19,671 (N.D.Ill. December 22, 1992) (Reinhard, J.) (although Judge Leinenweber's contrary reasoning in *Yampol* is sound, the Seventh Circuit permits contribution under

**4.** The *Lumpkin* court acknowledged that the issue of contribution is still unsettled. *Lumpkin*, 933 F.2d at 464 n. 10.

**5.** Plaintiffs' reliance on *Mutual Life Insurance Co. v. Yampol*, 706 F.Supp. 596 (N.D.Ill.1989) is unavailing, since *Yampol* predates *Lumpkin*.

**6.** The fact that Harris is named as a trustee to APT does not alter the fact that Ameritech may

ERISA). Accordingly, Salomon may sue for contribution.[5]

### 2. Breach of Fiduciary Duty

#### a. Liability for NISA's Acts and Omissions

In their motion to dismiss, plaintiffs argue that Salomon failed to allege that Ameritech breached any fiduciary duty. This argument principally derives from §§ 402(c)(3) and 405(d)(1) of ERISA. 29 U.S.C. §§ 1102(c)(3) and 1105(d)(1). Section 402(c)(3) authorizes a named fiduciary to appoint an investment manager to administer the assets of a pension trust fund, while under § 405(d)(1), a trustee is not responsible for an appointed investment manager's acts or omissions.

Salomon maintains that § 405(d)(1), which limits a trustee's liability for the acts of an investment manager, does not apply to Ameritech, because Ameritech is not a "trustee," but a named fiduciary. 29 U.S.C. § 1105(d)(1). Salomon's argument fails for two reasons. First, it is not clear that Ameritech is not a "trustee" within the meaning of § 405(d)(1).

Under ERISA, a "trustee or trustees shall either be named in the trust instrument or in the plan instrument ... and upon acceptance of being named or appointed, the trustee or trustees shall have exclusive authority and discretion to manage and control the assets of the plan, except to the extent that— ... (2) authority to manage, acquire, or dispose of assets of the plan has been delegated to one or more investment managers." 29 U.S.C. § 1103(a). Because the plan instrument named Ameritech as a fiduciary, and because Ameritech had control over the trust except to the extent that an investment manager was appointed, Ameritech falls within the definition of a "trustee." Accordingly, it may avail itself of the protection afforded by § 405(d)(1).[6]

also be a trustee. Not only does § 403(a) allow a pension trust to have more than one trustee, but in its amended complaint, plaintiffs specifically allege that Harris was a directed trustee. Amended Complaint at ¶ 6. In this circumstance, Ameritech exercised trustee responsibility, and under § 405(d)(1), it could not be held responsible for the acts or omissions of NISA.

■ Second, even if Ameritech is not a trustee, but simply a named fiduciary, the legislative history of ERISA, relevant regulation, and case law support the conclusion that § 405(d)(1) shields it from liability. In a "Joint Explanatory Statement of the Committee of Conference," Congress explained that "as long as the named fiduciary had chosen and retained the investment manager prudentially, the named fiduciary would not be liable for the acts or omissions of the manager." H.R.Conf.Rep. No. 1280, 93rd Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 5038, 5082. Additionally, the Department of Labor stated that named fiduciaries can delegate managerial authority over plan assets to an investment manager, thereby releasing the named fiduciary from liability for the acts or omissions of the person to whom authority was delegated. 29 C.F.R. § 2509.75–8, FR–14 Q & A. Finally, the Second Circuit has held that "[t]he obligations of named fiduciaries with regard to their duty of care ... can be reduced by the appointment of an investment manager under ERISA section 402(c)(3)." *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1219 (2d Cir.1987). Clearly, then, whether Ameritech is a trustee or a named fiduciary, it cannot be liable for the acts and omissions of the appointed investment manager, NISA.

**b. Liability for its Own Acts**

■ In addition to alleging that Ameritech is liable for the acts and omissions of NISA, Salomon seeks contribution from Ameritech for Ameritech's own actions. Under § 405(d)(2), a fiduciary may be liable for its own actions, despite appointment of an investment manager. 29 U.S.C. § 1105(d)(2). Salomon alleges that by authorizing and approving the purchase of the fee agreements, Ameritech independently breached the standard of care set forth in § 404(a)(1)(B), requiring a fiduciary to discharge its duties "with care, skill, prudence, and diligence under the circumstances then prevailing." 29 U.S.C. § 1104(a)(1)(B). Salomon further claims that if, as plaintiffs allege, the transac-

tions between APT and Salomon were prohibited under § 406, which forbids exchanges between a plan and a party in interest, then Ameritech is liable along with Salomon for the violation and is responsible for contribution. For their part, plaintiffs maintain that Ameritech lacked any decisionmaking authority over APT's purchases of the fee agreements, and thus had no fiduciary duties with respect to the transactions. Accordingly, plaintiffs aver that the counterclaims must be dismissed as a matter of law.

■ Whether Ameritech exercised control over APT's investment decisions such that it had fiduciary duties, and whether its alleged authorization and approval constituted a breach of those duties under the standard of care outlined in § 404(a)(1) are questions of fact. At this stage of the litigation, we cannot conclude as a matter of law that Ameritech had no decisionmaking authority over APT's purchases of the fee agreements, nor that its conduct comported with the requisite standard of care. While Ameritech asserts that the investment manager agreement between Ameritech and NISA vested NISA with complete authority over APT's assets, stripping Ameritech of any meaningful decisionmaking power, the amended complaint merely alleges that NISA was an investment manager. Nowhere do plaintiffs allege that NISA exercised sole authority over APT's assets.[7] Because ERISA finds fiduciary duties where there is actual authority, and because a trustee can retain some control over a pension trust's assets despite delegation of authority to an investment manager, it is possible that Ameritech retained and exercised actual control over the disposition of APT's assets such that it owed the fund a fiduciary duty of care. *See Leigh v. Engle*, 727 F.2d 113, 133 (7th Cir.1984) (under ERISA, a person's fiduciary duties are tied to his actual authority); 29 U.S.C. 1002(21)(A)(i) (an ERISA fiduciary is liable "to the extent he exercises any discretionary authority or discretionary control respecting management of such a plan"); 29 U.S.C. § 1105(d) (under this section, an investment

7. Nor will we consider matters outside the pleadings, such as the investment manager agreement, in ruling on this motion to dismiss. *See* Fed. R.Civ.P. 12(b); *In re First Chicago Corp. Secur. Litigation*, 769 F.Supp. 1444, 1450 (N.D.Ill. 1991).

management agreement removes the "obligation to invest or otherwise manage any asset of the plan" from the trustee, but still leaves a trustee liable for his own acts). Accordingly, we will not dismiss Salomon's counterclaims on these grounds.

### 3. General Trust Principles

■ Finally, plaintiffs argue that general trust principles, which govern any right to contribution under ERISA, preclude Salomon's recovery from Ameritech. Salomon does not contest that the right of contribution under ERISA is grounded in trust law principles. Nor does Salomon disagree that trust principles bar a fiduciary from receiving contribution if it fraudulently induced the other fiduciary (the potential contributor) to commit a breach. However, the parties part company on whether the articulated principles preclude Salomon's claim for contribution from Ameritech for any fiduciary breaches or prohibited transactions it may be adjudged to have committed.

In its counterclaims, Salomon alleges that "[i]f, hypothetically, the facts as alleged by Ameritech in the Second Amended Complaint are true, then Ameritech failed to discharge its duties as a fiduciary with the care, skill, prudence and diligence under the circumstances then prevailing...." Counterclaim at § 165. Elsewhere, Salomon alleges that "[i]f, hypothetically, it is nevertheless adjudged that defendants are liable to APT for breaches of fiduciary duties, for violations of ERISA's prohibited-transactions provisions, for participation in any fiduciary breaches by NISA or for other violations of federal or state laws, then plaintiff Ameritech should likewise be liable to APT or should be liable for contribution to defendants for any liability defendants may have to APT." Counterclaim at ¶ 162. Ameritech makes much of these statements, arguing that Salomon has admitted to fraud and therefore may not obtain contribution from Ameritech.

Salomon rejoins that its hypotheticals do not serve as admissions of any wrongdoing, nor do they dictate the context within which this Court should consider the merits of plaintiffs' motion to dismiss. We certainly do not read Salomon's counterclaims as admitting to any liability. Moreover, notwithstanding Salomon's speculations, we will not make assumptions regarding the nature or extent of Salomon's liability at this juncture. While it is true that Salomon's request for contribution is predicated on a finding that Salomon is at least partially liable, we cannot rule, as a matter of law, that Salomon will be deemed "more substantially at fault" than Ameritech so as to bar contribution. *See* Restatement (Second) of Trusts § 258(1) (contribution permitted between co-trustees "except that if one of them is substantially more at fault than the other, he is not entitled to contribution from the other but the other is entitled to indemnity from him....."). We therefore deny plaintiffs' motion to dismiss the counterclaims.

### III. Conclusion

For the foregoing reasons, we grant Salomon's motion to dismiss Counts IV through VII, XI and XII, deny Salomon's motion to dismiss Count III, and deny plaintiffs' motion to dismiss Salomon's counterclaims. It is so ordered.