**Carol HARLEY and James L. Raber, individually and on behalf of others similarly situated, Plaintiffs,**

v.

**MINNESOTA MINING AND MANUFACTURING COMPANY, Defendant.**

**No. Civ. 4–96–488(JRT/RLE).**

United States District Court, D. Minnesota.

March 31, 1999.

Alan M. Sandals, Sandals, Langer & Taylor, Philadelphia, PA, and Seymour J. Mansfield, Mansfield & Tanick, P.A., Minneapolis, MN, for plaintiffs.

Paul M. Wolf and Andrew Keyes, Williams & Connolly, Washington D.C., and James M. Dawson, Felhaber, Larson, Fenlon & Vogt, Minneapolis, MN, for defendant.

## MEMORANDUM OPINION
## AND ORDER

TUNHEIM, District Judge.

Plaintiffs, individually and on behalf of all others similarly situated, brought this action against defendant Minnesota Mining and Manufacturing, Co. ("3M"), alleging that 3M breached its fiduciary duty under section 404(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1104(a)(1)(B), by failing to invest prudently the assets of the 3M Employee Retirement Income Plan ("the Plan"). In an Order dated September 25, 1997, the Court certified a class of all participants and beneficiaries of the Plan ("the Class").

This matter is now before the Court on the Class's motion for partial summary

judgment on the issue of liability as to its "prohibited transaction" claim, defendant's cross-motion for dismissal or summary judgment on this claim, and defendant's motion for summary judgment (seeking dismissal of this action in its entirety). For the reasons set forth below, the Class's motion is denied, 3M's cross-motion is granted, and 3M's motion for summary judgment is denied.

## BACKGROUND

The Plan is a "defined benefit plan" subject to the terms of ERISA, 29 U.S.C. § 1001 *et seq.* As a defined benefit plan, the Plan is obligated to pay only a defined benefit to its participants upon retirement. It is a massive entity, encompassing thousands of participants and beneficiaries and containing total assets in excess of $4 billion.

It is undisputed that 3M is a fiduciary of the Plan and is responsible for overseeing the investment of Plan assets. 3M delegated this responsibility to its "Pension Asset Committee" ("the PAC"). 3M also has a staff dedicated to overseeing fund investments and assets. In 1990, members of the PAC decided to invest $20 million in Plan assets in Granite Corporation ("Granite" or "the fund"), a "hedge fund" containing collateralized mortgage obligations ("CMOs").[1]

Tony Estep, Granite's investment manager at the time 3M was first exploring an investment in Granite, initially met with 3M staff and gave the staff certain marketing materials about the fund. These materials stated that Granite's strategy would produce very high returns while investing in "low risk instruments." These materials also indicated the fund would maintain a "market neutral" strategy. However, Granite's 1990 Private Placement Memorandum ("PPM"), which 3M received shortly after the initial meeting with Estep, made clear that the investment faced substantial risks, including interest rate risks, potential difficulties in predicting market movements, possible illiquidity, and the risk of proportionally greater losses due to the use of leveraging. Moreover, the PPM disclosed that the fund's strategy may depend on the investment manager's ability to predict market movements and that there could be no assurance that a market neutral position could be achieved.

3M contends, without specification, that it made this investment after almost a year of its own investigation and analysis of the Granite strategy. The Class notes, however, that after Deborah Weiss, 3M's Manager of Pension Investments, recommended the Granite investment to the PAC, the PAC voted to make the investment after a brief (ten to twenty minute) discussion.[2] The Class further claims it was naive for Weiss and the PAC to accept Granite's representations that it could earn a very high, fixed rate of return while investing in low risk instruments. As set forth above, these representations were in conflict with the warnings of risk in the PPM, which only Weiss and 3M's ERISA counsel read. Moreover, Weiss had received information from other fixed-income investment managers suggesting that CMOs may have illiquidity problems, may be difficult to analyze, and may face substantial fluctuations in returns based on changes in prepayments. Yet no member of Weiss's staff or the PAC conducted a thorough, independent analysis of the risks associated with Granite's investment strategy. Likewise, although Weiss understood that the CMO market may be "thinly traded," neither she nor other staff or PAC members undertook an investigation to de-

---

1. CMOs are mortgage-backed bonds that are divided and repackaged in a way to appeal to investors who want more or less risk than the original underlying securities. These subdivisions are also known as "tranches." Some tranches, particularly those representing more junior positions, carry substantial risks. Two important, somewhat interrelated risks associated with CMOs are interest rate risk and mortgage borrower prepayment behavior.

2. Likewise, several meeting participants could not recall whether they discussed CMOs or Granite's strategy at the meeting.

termine whether Granite's valuations were valid or to unearth the risks associated with a potentially illiquid market.[3]

Weiss had limited exposure to CMOs prior to recommending the investment to the PAC. She also never conducted a background check on Estep, who, it turns out, did not have much experience with CMOs before starting Granite. It also appears undisputed that no member of the PAC committee or the Plan's staff who participated in the decision to invest in Granite had expertise in evaluating or investing in CMOs.[4] In fact, several members testified that they did not understand information Granite had given to them about the securities it was purchasing. Despite the PAC members' lack of expertise, at no time— before investing or during the period the Plan was invested in Granite—did 3M hire an "outside advisor" (in addition to Granite's managers) to evaluate the Granite investment or Granite's strategy.

After Estep resigned in 1991, David Askin took over as investment manager of Granite. The Class contends that withdrawal from Granite would have been appropriate at this point because Granite's returns had been far below the projected, "stable" high returns set forth in the marketing materials. Shortly thereafter, Askin formed Askin Capital Management ("ACM"), which served as Granite's investment manager throughout the rest of the relevant period. 3M personnel undertook minimal investigation of the impact on Granite from Estep's withdrawal and no investigation of Askin's experience. Weiss did talk to three other institutional investors in the fund: two chose to remain, and one decided to divest. She also interviewed Askin, but does not recall discussing his experience. Askin in fact had little previous experience managing and trading CMOs. According to the Class, this perfunctory review of Askin contradicted 3M's own stated policy of reviewing anew an investment in a fund with a new investment manager.

In implementing the Granite strategy, ACM was to purchase different and often volatile classes of CMOs which would respond to interest rate movements in various ways. At least in theory, these purchases were supposed to ensure that Granite remained market neutral and maintained a stable value despite changes in interest rates. ACM's application of the strategy also involved a high degree of leverage; in other words, the fund purchased CMOs on margin substantially in excess to investor equity to boost return. Despite its low returns under Estep, 3M's investment in Granite generated a 68.5% return prior to the market collapse in March 1994.

3M left to Granite's investment managers the task of implementing the Granite strategy.[5] 3M personnel therefore did not participate in the decisions regarding the selection of Granite's securities. In essence, 3M selected Granite's investment managers to implement Granite's strategy and relied on these managers once these Plan had invested.

Weiss and other staff members received periodic reports from ACM and would monitor Granite's returns.[6] However, 3M

---

**3.** The interaction between interest rates and mortgage prepayments can make the valuation of CMOs highly difficult and complex. In addition, the Class notes that, at certain times, there may be no ready market for CMOs.

**4.** Apparently, one member of the Plan's staff had attended a seminar regarding CMOs prior to 3M's decision to invest, but had no experience in investing in these instruments at that time. She later did invest in and analyze CMOs as part of her work for the plan, but she did not share what she had learned with other PAC members and staff. Also, the staff had some exposure to more

senior CMO tranches as a result of an earlier Plan investment

**5.** It is undisputed that, as to the assets invested in Granite, ACM also was appointed as an investment manager of assets of the Plan under § 1102(c)(3) of ERISA.

**6.** The Class's ERISA expert, Jeffrey Clayton, concluded that 3M's actions in overseeing the Granite investment did not comport with its fiduciary obligations. In his report, Clayton stated as follows:

> Because the [Granite] investment involved complex, illiquid and volatile financial in-

personnel never conducted their own, independent analysis of Granite's risk position or strategy at any time during the investment.[7] They also never evaluated whether ACM's valuations were accurate, whether its strategy had changed over time, or whether—given fluctuations in the market and other circumstances—the risks of the fund's investments had changed. In fact, Weiss and her assistant testified that 3M did not have sufficient staff to closely monitor Granite.

Both the 1990 and 1993 PPMs provided that the Plan would compensate Granite's managers through a performance-based "incentive" fee equal to fifteen percent of any increase in value in excess of the London Interbank Offered Rate ("LIBOR"). The Plan was to pay these fees annually, on the anniversary date of its investment, based on performance during the preceding twelve months. Both PPMs also indicated that the payment of these fees created an "inherent or potential" conflict of interest.[8] 3M only paid incentive fees to ACM once, on March 31, 1993, in the amount of approximately $1.1 million. 3M offers the opinion of one of its investment experts that this fee was reasonable compensation for ACM's services.

Following a significant and, according to 3M, unprecedented rise in interest rates in February and March 1994, the CMO market and Granite in particular experienced significant difficulties. As interest rates rose, the value of the CMOs owned by Granite dropped dramatically. To make matters worse, brokerage firms began demanding additional money from Granite to serve as margin for the leveraged CMOs Granite held. Because Granite was severely leveraged by this point, it collapsed and ultimately was liquidated. 3M wrote off the investment in its entirety.

During the investigation and litigation that followed Granite's downfall, it was revealed that Wall Street securities dealers had colluded wrongfully to foreclose on the loans they had made to the fund. In addition, Askin admitted to investors that he had inflated improperly the value of Granite's portfolio in February 1994. It also became obvious that ACM had failed to implement the purported strategy of remaining market neutral. In May 1994, Weiss told the PAC that the prices of CMOs had been theoretical and that CMO brokers and Askin would negotiate a price and the brokers would provide confirmation to satisfy auditors.[9]

The parties dispute whether, given the information available prior to the collapse in 1994, prudent fiduciaries would have invested in Granite. 3M provides the opinion of three of its experts to support its contention that its investment in Granite was appropriate. 3M also points out that approximately ninety sophisticated investors besides 3M chose to invest in Granite. In addition to its other evidence, the Class offers an expert opinions that 3M failed to discharge its fiduciary duties in investigating and monitoring the Granite investment. According to one of the Class's experts, 3M's failure to investigate and monitor the investment led to its failing to act upon obvious and numerous "red

struments and because the strategy was novel and unproven, the Plan fiduciaries had a *heightened responsibility to discover and understand* how the investment was performing and whether the stated strategy and methodology was being followed by the manager.

7. Weiss was aware during this period that some sophisticated CMO investors had experienced significant losses. Also, another staff person had noticed at one point that Granite's leverage position was as high as seven to one, but he made no report of this nor conducted any further investigation.

8. For example, the 1990 PPM stated in part:

Because the Adviser's compensation increases with an increase in Net Gains, this arrangement may create an incentive for the Adviser to make more speculative investments on behalf of the Fund than it would otherwise make if it received compensation unrelated to the investment performance of the Fund.

9. Certain members of the PAC later testified that they were not aware, prior to Granite's collapse, of ACM's use of leverage.

flags," warning of existing and increasing investment risks.

The Class contends that the total depletion of plan assets resulting from Granite's demise is approximately $80 million. 3M does not quarrel specifically with this figure, but instead notes that the Granite investment accounted for less than one percent of the Plan's assets. Moreover, despite the loss, the Plan has never failed to make any payments it owes to its participants and beneficiaries. Also, taking the Granite loss into account, the Plan's portfolio prospered during this period and achieved its goals and all internal benchmarks. In fact, on a portfolio-wide basis, the Plan outperformed ninety-five percent of its peer group of investment funds over the life of the Granite investment.

Furthermore, 3M contends that the Granite investment caused the Plan no harm because it operated at a surplus during the entire period. According to David E. Delahanty, 3M's actuarial expert, the Plan had a surplus in excess of $300 million at the time the Granite loss was realized, and that surplus now had grown to just under $500 million. Also, it appears undisputed that 3M contributed "voluntarily" over $500 million to the Plan between 1990 and 1996, a figure which represents payments in excess of the contributions the Internal Revenue Code ("IRC") requires.[10]

The Class offers no expert testimony in response. Instead, Class counsel challenged Delahanty's assumptions during his deposition. Delahanty admitted that his assessment of the Plan's financial condition was based on projections that were far less conservative than, for example, those mandated in the Omnibus Budget Reconciliation Act of 1987 ("the OBRA") and the Retirement Projection Act of 1994 ("the RPA"). Moreover, the Class notes that if the Plan were terminated, an even more conservative set of assumptions would be applicable. Under these accounting methods, the Plan was underfunded, at least as of January 1, 1996.

In an affidavit submitted with 3M's reply memorandum, Delahanty contends that his method for calculating the financial condition of the Plan is actuarially sound. He also states that the methods employed by class counsel—including those based on the OBRA and the RPA—are premised on artificially low rates of return. His analysis, on the contrary, is based on an assumed rate of return that is higher, but reflects (conservatively) the Plan's actual rate of return over the past twenty years. Thus, according to Delahanty, his calculations more accurately reflect the Plan's funding status.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment, stating in pertinent part:

> [Summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Initially, the movant bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the movant's showing, the evidence offered by the non-moving party is to be believed and all justifiable inferences therefrom are to be drawn in the light most favorable to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d

---

**10.** 3M contributed over $400 million of this amount after Granite's meltdown.

538 (1986). Where a moving party makes and supports a motion for summary judgment in accordance with Rule 56, a party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. 2505; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995). Accordingly, the nonmovant "must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial." *Wilson v. Southwestern Bell Tel. Co.*, 55 F.3d 399, 405 (8th Cir.1995).

## ANALYSIS

The Class claims that 3M breached its fiduciary duty to act prudently under § 1104(a)(1)(B) by investing Plan assets in Granite without thoroughly investigating, monitoring, and understanding all aspects of the Granite investment. In addition, the Class claims that 3M breached its fiduciary duty under this section by making and maintaining the investment under circumstances which clearly presented a prohibited transaction under § 1106(b)(1). The Class moves for partial summary judgment as to liability on the latter theory.

3M moves for dismissal or summary judgment on both theories. It first argues that the Class has failed to establish a breach of any fiduciary duty under ERISA. In addition, 3M argues that the alleged breach caused none of the Granite losses and that the Class has suffered no harm as a result of any such breach. As to the Class's "prohibited transaction" claim in particular, 3M contends it is entitled to dismissal or summary judgment because the Class failed to plead this claim and cannot establish that ERISA prohibits the Granite investment.

ERISA imposes on benefit plan fiduciaries a strict standard of care:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims....

29 U.S.C. § 1104(a)(1)(B). Under § 1109(a), a fiduciary who breaches the aforementioned duty "shall be personally liable to make good to such plan any losses to the plan resulting from each said breach."

■ A breach of fiduciary duty claim under ERISA involves a three-step analysis. *See, e.g., Roth v. Sawyer–Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994) (citing *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir.1992), *cert. denied*, 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993)). First, the Class bears the burden of proving a breach of fiduciary duty. *See id.* The Class must also prove a prima facie case of loss to the Plan. *See id.* Once the Class has satisfied these burdens, the burden of persuasion shifts "to the fiduciary to prove that the loss was not caused by ... the breach of duty." *Id.* (quoting *Martin*, 965 F.2d at 671).

3M argues that *Martin* and its progeny do not stand for the proposition that it bears the burden of proof on the issue of causation. To support this contention, it relies principally on the concurring opinion in a Second Circuit decision, *see Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 106 n. 1 (2nd Cir.) (Jacobs, J., concurring), *cert. denied*, —— U.S. ——, 119 S.Ct. 178, 142 L.Ed.2d 145 (1998), in which two members of that court viewed the issue in *Martin* as relating merely to the calculation of damages. This Court disagrees with this reading of *Martin*. *Martin* and its progeny provide that, in an ERISA breach of fiduciary duty case, the defendant bears the burden on the issue of causation once the plaintiff proves a breach and provides evidence of a loss to the plan.[11] *See Roth*, 16 F.3d at 917;

---

11. In *Roth,* 16 F.3d at 917 the Eighth Circuit described how an ERISA defendant can pre-

*Martin,* 965 F.2d at 671; *see also Felber v. Estate of Regan,* 117 F.3d 1084, 1088 (8th Cir.1997) (going out of its way to point out to future litigants *Martin*'s burden-shifting framework). Moreover, the *Martin* court noted that it would not "take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would be the same." 965 F.2d at 671–72 (quoting *In re Beck Indus.,* 605 F.2d 624, 636 (2nd Cir. 1979)). While the Second Circuit now may hold otherwise, in this circuit, the defendant bears the burden on this issue. The Court will address separately the elements of breach (for both the Class's general claim and its "prohibited transaction" theory), loss, and causation.

## 1. Breach of Fiduciary Duty

### A. The Class's General Standard of Care Claim

■ The Class contends that 3M breached its duty to act as a prudent fiduciary by failing to conduct an independent and thorough investigation of the Granite investment, including failing to acquire sufficient understanding about CMOs and Granite's strategy before investing. Also, the Class claims that the Plan's staff and PAC members lacked the capabilities to monitor the ongoing Granite investment, failed to take adequate steps to oversee the investment, and failed to conduct a proper analysis of whether to remain invested in Granite when ACM took over as the investment manager.

3M argues that the Class has mischaracterized the appropriate standard of care and has offered insufficient evidence to establish breach under the appropriate standard. Specifically, 3M argues that the Class erroneously insists that ERISA requires fiduciaries to be "prudent experts," that fiduciaries cannot rely on the expertise of a carefully chosen investment man-

ager, and that the Granite investment should be evaluated in a vacuum rather than in the context of the Plan's entire portfolio. 3M also contends that the Class's claim fails because it has not shown that further diligence would have revealed that the investment was inappropriate.

■ The Court finds that genuine issues of material fact preclude summary judgment on the issue of breach. The "prudent person" standard articulated in § 1104(a)(1)(B) is objective, focusing on the fiduciary's conduct preceding or at the time of the challenged conduct. *See Roth,* 16 F.3d at 917–18. Under this standard, a fiduciary is obligated to undertake an independent investigation of the merits of an investment and to use appropriate, prudent methods in conducting the investigation. *See, e.g., In re Unisys Sav. Plan Litig.,* 74 F.3d 420, 435(3d Cir.) ("[T]he most basic of ERISA's investment fiduciary duties [is] the duty to conduct an independent investigation into the merits of a particular investment."), *cert. denied,* 519 U.S. 810, 117 S.Ct. 56, 136 L.Ed.2d 19 (1996); *Liss v. Smith,* 991 F.Supp. 278, 297 (S.D.N.Y.1998) (stating that the failure to make an independent investigation and evaluation has "repeatedly been held to constitute a breach of fiduciary obligations") (citing cases); · *Whitfield v. Cohen,* 682 F.Supp. 188, 194 (S.D.N.Y.1988) (stating that the "test of prudence focuses on the trustee's conduct in investigating, evaluating and making the investment," and indicating that the trustee's failure to make an independent investigation is a breach of fiduciary duty) (citing *Fink v. National Sav. and Trust Co.,* 772 F.2d 951, 957 (D.C.Cir.1985)). Once the investment is made, a fiduciary has an ongoing duty to monitor investments with reasonable diligence and remove plan assets from an investment that is improper. *See, e.g.,*

vail at the summary judgment stage in light of this allocation of trial burdens:

> As the party moving for summary judgment, however, the trustees can prevail only by demonstrating the absence of a genuine issue of material fact either on the

elements of the claim for which the plaintiffs bear the burden of persuasion at trial or on the elements for which the trustees themselves bear the burden of persuasion at trial.

*Liss,* 991 F.Supp. at 299 (noting, in finding a breach of fiduciary duty, that the fiduciaries had failed to monitor the performance of the fund's broker); *Hunt v. Magnell,* 758 F.Supp. 1292, 1299 (D.Minn.1991) ("ERISA fiduciaries must monitor investments with reasonable diligence and dispose of investments which are improper to keep."); *Whitfield,* 682 F.Supp. at 196. Typically, whether a fiduciary acted prudently—or in other words, as a reasonably prudent fiduciary—is a question of fact. *See, e.g., Roth,* 16 F.3d at 919 (finding that whether the fiduciaries acted reasonably in the circumstances presented involved a question of fact precluding summary judgment).

■ Viewing the facts in a light most favorable to the Class, a reasonable fact finder could conclude that 3M's investigatory and monitoring methods and actions were below ERISA's standard of reasonable care. At the time 3M chose to invest in Granite, no staff person or PAC member had expertise or experience in evaluating or investing in CMOs. The Court agrees with 3M that ERISA does not impose a rule that fiduciaries be "experts" on all types of investments they make. However, if a fiduciary lacks the education, experience, or skills to be able to conduct a reasonable, independent investigation and evaluation of the risks and other characteristics of the proposed investment, it must seek independent advice. *See, e.g., Liss,* 991 F.Supp. at 297 (citing cases and stated that "where the trustees lack the requisite knowledge, experience and expertise to make the necessary decisions with respect to investments, their fiduciary obligations require them to hire independent professional advisors"); *Whitfield,* 682 F.Supp. at 194 (citing *Donovan v. Bierwirth,* 680 F.2d 263, 272–73 (2nd Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982)); *see also* § 1104(a)(1)(B) (requiring fiduciaries to act

with "the care, *skill,* prudence and diligence that a prudent man acting in a like capacity and familiar with such matters would use") (emphasis added). Here, while Weiss received some feedback on CMOs from various investment advisors, neither she nor others at 3M sought out advice from knowledgeable sources on the risks associated with Granite's investment in CMOs or the fund's overall strategy.[12] *Cf. Restatement (Third) of Trusts* § 227 cmt. n (1992) (stating that, for investments in mortgage-backed securities, trustees "have a duty to exercise the care and skill necessary to understand [the securities'] risks and other characteristics").

Moreover, there is a fact dispute whether 3M personnel, on their own, conducted a sufficient investigation of the Granite investment and undertook sufficient deliberation of the fund's characteristics before deciding to invest. The staff's inquiries regarding CMOs were limited, and many PAC members quickly approved the investment without reading the PPM or seeking out other information. The failure of staff and PAC members to undertake a more critical analysis is particularly troubling in light of the apparent conflict between representations regarding risk in Granite's marketing materials and the significant risks and other factors outlined in the PPM. 3M therefore may have breached its fiduciary duty in failing to conduct an sufficient investigation prior to investing.

Likewise, the Class has raised a fact dispute with regard to whether it undertook reasonably prudent efforts to monitor the investment. 3M points out that it retained Granite's investment managers as the "experts" to oversee this investment. It contends that it did not need hire a "second expert" to oversee these managers. While the Court agrees that ERISA does not impose a *per se* "second expert"

---

**12.** Indeed, some of the feedback Weiss received should have raised red flags, since a number of the comments suggested that CMOs can be subject to prepayment and liquidity risks and may be difficult to analyze.

A fact finder could conclude that such information would have led a prudent fiduciary—who is not an expert on CMOs—to conduct additional investigation or seek out particularized expert advice.

requirement, in the circumstances of this case, a fact finder could conclude that resort to some kind of outside assistance would have been necessary to satisfy 3M's duty of reasonable prudence. Certainly, ERISA does not require a plan fiduciary to hire an additional, outside person to second-guess each investment decision the retained investment manager makes. Yet after 3M appointed Granite's managers to oversee the Granite investment, 3M still had an obligation to supervise and monitor that investment.[13] When viewed in its most favorable light, the Class's evidence shows that 3M personnel simply were unable to monitor the Granite investment effectively: they did not have sufficient staff or expertise to analyze fully Granite's periodic reports or the securities Granite held, to perform stress tests on the risks associated with the fund's strategy, and to evaluate whether ACM was managing Granite appropriately or whether there were changes in fund's strategy. Because its lack of skill and resources arguably rendered 3M's monitoring efforts virtually useless, the Court believes that prudence may have required 3M to seek out assistance in monitoring the Granite investment.[14]

3M also argues that the Class's claim inappropriately focuses on the Granite investment alone, without viewing it as part of the overall strategy for the 3M Plan. 3M argues that this investment was merely part of a prudent overall strategy and that the entire portfolio undisputedly outperformed the vast majority of the funds in its peer group. The Court rejects this argument in this context. The Class is not contending merely that 3M violated its fiduciary duties by choosing (knowingly) to

13. Because it delegated to Granite's managers the fiduciary duty to administer the Plan's assets according to agreed upon terms relating to that investment, 3M is not subject to liability for acts or omissions of the managers that contravene those terms. See, e.g., 29 U.S.C. § 1105(d)(1); Harris Trust and Sav. Bank v. Salomon Bros., Inc., 832 F.Supp. 1169, 1177 (N.D.Ill.1993) ("Section [1102(c)(3) ] authorizes a named fiduciary to appoint an investment manager to administer the assets of a pension trust fund, while under [§ 1105(d)(1) ], a trustee is not responsible for an appointed investment manager's acts or omissions"). This does not relieve 3M of its oversight responsibilities, however. 3M hired Granite's managers to implement the Granite strategy; whether that strategy was prudent throughout the relevant period remains within 3M's domain of responsibility. Cf. Whitfield, 682 F.Supp. at 196 (stating that a plan trustee had a duty to monitor an investment with reasonable diligence and withdraw the investment if it was no longer proper for the plan). As such, 3M had a duty to monitor the investment to ensure that it remains a prudent investment for the plan. See id.; see also Harris, 832 F.Supp. at 1178 ("Because ERISA finds fiduciary duties where there is actual authority, and because a trustee can retain some control over a pension trust's assets despite delegation of authority to an investment manager, it is possible that [the trustee] retained and exercised actual control over the disposition of [the fund's] assets such that it owed the fund a fiduciary duty of care.").

In addition, 3M was obligated to conduct an evaluation of Askin (and ACM) when he took over as Granite's investment manager. See, e.g., Whitfield, (suggesting that ERISA requires, among other things, evaluation of an investment manager's experience and credentials). There is a fact dispute whether 3M properly evaluated its continuing investment in Granite when Askin became the investment manager because the staff and PAC may have failed to undertake a reasonable investigation of Askin's (and ACM's) credentials and expertise. This calls into doubt 3M's contention that they delegated investment management responsibilities to a "carefully selected" investment manager.

14. Moreover, 3M's allegedly blind reliance on Granite's investment managers is particularly troubling given that the managers' livelihood was derived from the success of the investments. Although these managers were plan fiduciaries, the Court believes that a fact finder could conclude that this compensation structure required 3M to take even greater care in understanding, evaluating, and monitoring the overall investment strategy. Cf. Liss, 991 F.Supp. at 299 (finding that plan fiduciaries had breached their duty by blindly relying on the recommendations and strategies of a broker whose livelihood was derived from commissions). This is particularly true since Granite's managers openly disclosed in the PPMs that they had a potential and inherent conflict of interest that could create an incentive to invest in more speculative investments.

make an investment that involved some risk or other characteristic. If that were the Class's theory, an analysis of whether the investment chosen was prudent would be dependent on an evaluation of how it fit into the larger portfolio strategy, including how it counterbalanced other risks in the portfolio. Rather, the Court interprets the Class's claim to be that, by failing to properly investigate, understand, and monitor the Granite investment, 3M unknowingly made and maintained an investment posing severe risks that a prudent fiduciary would not have tolerated in the Plan's portfolio. While it is important to look at the structure of the entire portfolio to determine whether stated objectives with regard to a particular investment are sound, how the remainder of the portfolio performed is not determinative, where, as here, the particular investment allegedly contains unplanned and unacceptable risks within (or regardless of) the overall portfolio objectives.[15] Again, the Court finds fact disputes preclude summary judgment on the issue of whether a prudent fiduciary in 3M's position would have made and maintained the Granite investment.

Finally, 3M asserts that the Class has failed to demonstrate a breach of duty because there is no evidence that 3M personnel would have discovered additional information had they taken further steps. *See, e.g., Kuper v. Iovenko*, 66 F.3d 1447, 1460 (6th Cir.1995) (stating that a plaintiff must show that an adequate investigation would have revealed that the investment at issue was improvident); *see also Unisys*, 74 F.3d at 436 (stating that "the thoroughness of a fiduciary's investigation is measured not only by the actions it took in performing it, but by facts that an adequate investigation would have uncovered"). The Court finds that there are sufficient facts in the record to preclude summary judgment on this basis. The Class has offered evidence that many staff and PAC members mistakenly thought

Granite was a low-risk investment, did not understand the risks associated with CMOs and the CMO market, did not know that Granite was highly leveraged, did not know that Granite's managers lacked experience with CMOs, were not aware of potential illiquidity problems, were not able to appreciate the nature of Granite's strategy, and did not realize or understand the changes over time in Granite's leverage and hedge position. Moreover, the differences between the risk disclosures in the marketing materials and the PPMs, Granite's change in investment managers, and the structure of ACM's compensation, all were factors about which 3M decision makers should have known and deliberated. Had the staff and PAC undertaken adequate investigation, deliberation, and monitoring activities, they all would have learned of these risks and other circumstances, and factored them into the decision of whether to make or maintain the investment. A fact finder could conclude that a reasonably prudent fiduciary, armed with all of this information, would have determined that the Granite investment contained significant risks and unknown dangers, and therefore was improvident.

## B. The Class's "Prohibited Transaction" Claim

▮ In addition to its general duty of care claim under § 1104(a)(1)(b), the Class offers a separate theory of breach. It claims that 3M should have known, based on the PPMs and even minimal investigation, that ACM had the ability to influence the prices of CMOs in the "thinly traded" CMO market and affect its incentive-based compensation. The Class contends that this constituted a *per se* forbidden use of Plan assets—under § 1106(b)(1)—by ACM to benefit its own compensation. According to the Class's theory, 3M thereby breached its fiduciary duty under § 1104 in making and maintaining the investment

---

**15.** The Department of Labor regulation on which 3M relies therefore is inapposite because it simply counsels against judging investments with a certain level of anticipated risk to be *per se* imprudent, without addressing the role these investments play in the overall portfolio strategy. *See* 44 Fed.Reg. 37,221, 37,222 (1979).

under circumstances which presented a clear prohibited transaction.

3M's response is multi-layered. It first argues the claim should be dismissed under Rule 8(a)(2) of the Federal Rules of Civil Procedure ("Rule 8(a)(2)"), because the Class failed to include this claim in the Amended Complaint and otherwise has not given 3M proper notice of it. 3M also contends that "reasonable compensation [to fiduciaries] for services rendered" are exempted from 1106(b)'s prohibited transaction rules under § 1108(c)(2) and that the fees it paid to ACM were reasonable. Finally, 3M makes a number of other arguments why—even if ACM engaged in a prohibited transaction—3M did not violate its duty to act diligently and prudently.

The Court finds that 3M is entitled to summary judgment on this claim. As an initial matter, 3M's contention that the Class did not give it proper notice of this claim is not without merit. Although the Class set forth general allegations regarding 3M's breach of its fiduciary obligations under § 1104(a)(1)(B) (some of which relate to compensation and securities valuation issues), the Amended Complaint does not contain a "short plain statement" indicating that the Class was seeking relief under this "prohibited transaction" theory. *See* Rule 8(a)(2) (requiring that the pleader set forth in the pleading "a short and plain statement of the claim showing that the pleader is entitled to relief"). In fact, the Amended Complaint does not refer at all to prohibited transactions. Also, while the Class is able to cite to evidence in the record that relates to or supports its prohibited transaction claim, it cites to nothing that suggests 3M was actually on notice that the Class would be proceeding under this theory. Moreover, the fact that the Class's theory has changed since it filed its motion for partial summary judgment—the claim initially was that the compensation structure violated § 1106(a) rather than § 1106(b)(1)—provides further support for 3M's contention that it has had to confront a moving target.

Nevertheless, even assuming 3M had sufficient notice of this theory such that it is not prejudiced by the Class's failure to plead it more plainly, the Court finds that 3M is entitled to summary judgment because there is no evidence in the record to support the claim. Section 1106(b)(1) prohibits a plan fiduciary from "deal[ing] with assets of the plan in his own interest or for his own account." However, § 1108(c) provides in relevant part:

*Fiduciary benefits and compensation not prohibited by section 1106*

Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from—

(2) receiving any reasonable compensation for services rendered ... except that no person so serving who already receives full-time pay ... shall receive compensation from such plan....

Although the Class argues that Labor Department regulations and case law make clear that § 1108's exemptions do not apply to alleged violations under § 1106(b), these cited authorities only preclude application of § 1108(b) exemptions. *See* 29 C.F.R. § 2550.408b–2(e)(1) ("If the furnishing of office space or a service involves an act described in [§ 1106(b) ], such an act constitutes a separate transaction which is not exempt under [§ 1108(b)(2) ]."); *Daniels v. National Employee Benefit Servs., Inc.,* 858 F.Supp. 684, 693 (N.D.Ohio 1994) (addressing whether the exemption set forth in § 1108(b)(2) applies in the § 1106(b) context and relying on 29 C.F.R. § 2550.408b–2(e)(1)); *Lowen v. Tower Asset Management, Inc.,* 653 F.Supp. 1542, 1554–55 (S.D.N.Y.), *aff'd,* 829 F.2d 1209 (2nd Cir. 1987) (finding a § 1108(b) exemption to be inapplicable to § 1106(b) violations but finding the § 1106(c)(2) to be inapposite in the circumstances for other reasons). None of these authorities suggests that § 1108(c)(2)'s exemption is inapplicable. *Cf. Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1216 (2nd Cir.1987) ("Section [1108(c)(2) ] provides that

[§ 1106] shall not be construed to prohibit any fiduciary from 'receiving any reasonable compensation for services rendered . . . .' "). Absent clear and authoritative direction to the contrary, the Court will not ignore the plain language of the statute. Thus, ACM's incentive-based compensation structure only constituted a "prohibited transaction" under ERISA if ACM received more than "reasonable compensation for services rendered." [16]

The Court finds that the Class has presented no evidence that ACM's compensation was unreasonable. ACM was compensated by the Plan only once, in March of 1993. Although the Class has offered evidence that ACM had the ability to negotiate prices and valuations of CMOs with dealers and evidence that, in 1994, it artificially inflated the value of the securities it held, there is no evidence that the March 1993 payment was the result of any inflationary tactics. In addition, nothing in the record suggests that the amount ACM actually received—approximately $1.1 million—was unreasonable compensation for the services it had rendered during the relevant period. On the contrary, 3M offers the only evidence on this matter, an expert opinion that this amount was reasonable.

Obviously then, there can be no finding that, through greater diligence and investigation at the time, 3M personnel would have discovered that ACM was charging unreasonable fees.[17] That 3M personnel knew or should have known that ACM had the ability to manipulate prices and charge

unreasonable fees is not enough; the Class must demonstrate that 3M should have discovered that ACM actually caused the Plan to pay fees in excess of that to which it was entitled. *Cf. Acosta v. Pacific Enters.*, 950 F.2d 611, 621 (9th Cir. 1991) (affirming the dismissal of a § 1106(b)(1) claim and stating that "[a]ll fiduciaries have the inherent power that would enable them to deal with assets of ERISA plans for their own benefit or account . . . . [but] we know of no rule that permits a plaintiff to bootstrap a claim for the actual commission of a wrong merely by alleging that the defendant had the power to commit it").

Thus, the Class's prohibited transaction claim must be dismissed because there are no facts from which a finder of fact could conclude that 3M breached its duty of care.[18] 3M's cross-motion for summary judgment on this claim therefore is granted, and the Class's motion for partial summary judgment is denied.

## II. Losses to the Plan

■ The Class claims that 3M must compensate the Plan for losses of approximately $80 million resulting from the Granite investment. 3M responds that, despite the total loss of the investment, the Plan has suffered no cognizable damages for two reasons. First, 3M argues that damages to the Plan must be measured by reference to the entire portfolio. Given that the Plan undisputedly prospered on a portfolio-wide basis, met its benchmarks, and outperformed the vast majority of its

16. It is undisputed that ACM received no payment from the 3M plan other than this compensation. Thus, it is not excluded from the § 1108(c)(2) exemption on account of receiving other "full-time pay."

17. The Class notes that Weiss had some concern about Granite's fees prior to making the investment. However, there is no evidence that she had a concern that its fees were unreasonable, that she had any reason to believe the fees actually paid were unreasonable, or that she knew or should have known that ACM ultimately would manipulate prices. Moreover, while it is clear in hindsight that Askin manipulated prices—at least in 1994—

there is no evidence to suggest that 3M could have discovered any manipulation even if it had conducted a thorough investigation prior to the Plan's 1993 payment.

18. The Court notes that ACM's compensation structure and the warnings in Granite's PPMs regarding the conflict of interest this structure creates still are relevant to the Class's surviving claim. As discussed previously, the presence of this type of compensation arrangement may have led a prudent fiduciary to second-guess the Granite investment and to monitor more closely ACM's valuations and strategy.

peers throughout the period of the Granite investment, the Plan has not been damaged. Second, 3M contends that the Plan has not been damaged because it voluntarily contributed over $500 million to the Plan between 1990 and 1996, the Plan has never missed a payment to its beneficiaries, and the Plan had a surplus in excess of $300 million at the time Granite collapsed which has now grown to just under $500 million. The Class responds that it does not matter whether the Plan's overall performance has been positive; if 3M breached its duties as to the Granite investment, the Plan is entitled to the loss in asset value attributable to that breach.

The Court rejects 3M's first argument. 3M is obligated to make good losses to the Plan resulting from its breach. *See* § 1109(a). That the Plan's portfolio as a whole profited during the period of the Granite investment does not immunize 3M from liability for its alleged breach of fiduciary duty. As the Eighth Circuit indicated in adopting the Second Circuit's loss analysis in *Donovan v. Bierwirth,* 754 F.2d 1049, 1057 (2nd Cir.1985), the loss is determined "by comparing the [plan's] actual profit to potential profit that could have been realized in the absence of breach." *Roth v. Sawyer–Cleator Lumber Co.,* 61 F.3d 599, 604 (8th Cir.1995).

Moreover, this is not a circumstance in which gains in other parts of the portfolio should be offset against losses resulting from the challenged investment. As discussed in the previous section, the Class is not attempting to criticize 3M's investment strategy and then isolate a single unsuccessful investment to calculate the loss. Rather, the Class claims that no prudent fiduciary in 3M's position would have made and maintained the Granite investment, even if 3M's strategy and objectives were otherwise sound.[19] For this reason, the

Court finds inapposite the Seventh Circuit's theoretical discussion in *Leigh v. Engle,* 858 F.2d 361, 368 (7th Cir.1988), of the logic of looking at the performance of the entire portfolio. Thus, assuming *arguendo* that 3M breached its duty by investing in Granite, the loss is the difference between the Plan's actual profits and the profits it would have achieved had there been no breach.

■ 3M's second argument has more merit, however. While the Granite investment caused the Plan's portfolio to suffer a setback, 3M has made far more significant, allegedly voluntary contributions to the Plan. In addition, at least according to 3M, the Plan has a substantial surplus. The Court believes, in the unique circumstances of this case, that if 3M indeed has contributed amounts sufficient to put the Plan's portfolio in a surplus position, the Granite investment has not caused the Class or the Plan any cognizable harm.

The Supreme Court's opinion in *Hughes Aircraft Co. v. Jacobson,* —— U.S. ——, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999), is particularly instructive here.[20] In *Hughes Aircraft,* a group of retired beneficiaries brought suit, claiming that Hughes, the employer and plan administrator, had violated ERISA by amending the Plan to provide for early retirement and noncontributory benefits. *See id.* at 759–60. The Court rejected plaintiffs' claims, concluding in part that because Hughes only had used surplus funds to fund the newly created benefit programs, plaintiffs were never deprived of their interest in their accrued benefits. *See id.* at 762.

The plan at issue in *Hughes Aircraft,* like the 3M Plan, is a "defined benefit plan" under ERISA. In distinguishing a defined benefit plan from a defined contri-

---

19. In other words, even assuming that it was prudent for 3M to invest the $20 million in a relatively risky investment, had its personnel undertaken proper investigative and monitoring efforts, they would have uncovered information which would have led a prudent fiduciary to avoid Granite.

20. The Supreme Court decided *Hughes Aircraft* after oral argument on this matter. 3M notified the Court of the *Hughes Aircraft* decision by letter, and the Class responded to the decision in the same manner.

bution plan, the Supreme Court summarized the critical attributes of the former as follows:

> A defined benefit plan ... consists of a general pool of assets rather than individual dedicated accounts. Such a plan, "as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment." The asset pool may be funded by employer or employee contributions, or a combination of both. But the employer typically bears the entire investment risk and—short of the consequences of plan termination—must cover any underfunding as the result of a shortfall that may occur from the plan's investments. Conversely, *if the defined benefit plan is overfunded, the employer may reduce or suspend his contributions.*

The structure of a defined benefit plan reflects the risk borne by the employer. Given the employer's obligation to make up any shortfall, no plan member has a claim to any particular asset that composes a part of the plan's general asset pool. Instead, members have a right to a certain defined level of benefits, known as "accrued benefits." That term, for purposes of a defined benefit plan, is defined as "the individual's accrued benefit determined under the plan [and ordinarily is] expressed in the form of an annual benefit commencing at normal retirement age." In order to prevent a subsequent downward departure in benefits below a member's contribution amount, a defined benefit plan participant has a nonforfeitable right to the greater of (1) the benefits provided under the plan or (2) the amount derived from the employee's accumulated contributions, determined using an interest rate fixed by statute. Given this accumulated contribution floor, plan members generally have a nonforfeitable right only to their "accrued benefit," so that a plan's actual investment experience does not affect their statutory requirement. *Since a decline in the value of a plan's assets does not alter accrued benefits, members similarly have no entitlement to share in a plan's surplus —* even if it is partially attributable to the investment growth of their contributions.

*Id.* at 761–62 (citations omitted and emphasis added). The Supreme Court therefore concluded that because Hughes did not deprive participants of their accrued benefits when it used the surplus to fund new benefit programs, the participants suffered no detriment. *See id.* at 762.

This Court believes the analysis in *Hughes Aircraft* is applicable here. It is true, as the Class points out, that the Supreme Court provided the above analysis in the context of addressing the plaintiffs' vested-benefits and anti-inurement claims while separately rejecting plaintiffs' breach of fiduciary duty claims on other grounds. *See id.* at 762–64. Yet nowhere in its decision did the Court state that its conclusions regarding surpluses in defined benefit plans do not implicate fiduciary duty claims relating to an employer's management of plan assets.[21]

It is worth noting that in *Bennett v. Conrail Matched Savings Administrative Committee,* 168 F.3d 671, 676–78 (3rd Cir. 1999), the Third Circuit held, relying in part on *Hughes Aircraft,* that participants of a defined contribution plan are not entitled to surplus assets at termination or partial-termination. In that case, the court specifically found that plan participants lacked standing to bring *breach of fiduciary duty* claims because they were not entitled to any surplus. *See id.* at 678.

---

21. The theory the Court rejected in *Hughes Aircraft* posited that an employer could not, consistent with its fiduciary obligations, amend the plan to the alleged detriment of the existing participants and to the alleged benefit of the employer. *See id.* at 760, 763. The Court rejected these claims, finding that an employer does not act in a fiduciary capacity when it amends a plan, and that the amendments did not constitute a sham transaction. *See id.* at 763–64. The Court never indicated that fiduciary claims relating to investment of plan assets are exempted from its analysis of the nature of defined benefit plans.

Arguably, *Bennett* is distinguishable from this case because it involved a surplus existing when the plan was terminated. Indeed, the Class argues that where, as here, a supposed surplus is a transient phenomenon that is subject to future change, it should not operate to preclude recovery for investment losses resulting from the breach of fiduciary duties.[22] However, the circumstances and reasoning in *Hughes Aircraft* demonstrate that the potential for future fluctuations in plan assets does not affect the analysis. *Hughes Aircraft* involved an amendment of the Plan, not a termination. In that context, the Court simply stated that participants have no entitlement to the *existing* surplus, without expressing concern for potential fluctuations in plan assets in the future. *See* —— U.S. at ——–——, 119 S.Ct. at 761–62. Again, this point is most clearly illustrated by the fact that, despite future uncertainties, employers may reduce or suspend their contributions as long as accrued benefits presently are funded. *See id.*

The Supreme Court's reasoning governs the Class's breach of fiduciary duty claim. Under § 1109(a), a fiduciary is responsible for making good to the plan "any losses to the plan." Yet if the Plan is overfunded as a result of charitable growth in the portfolio investments and 3M's contributions, 3M can cease its contributions until the surplus is gone. *See id.* at 761. The existence of a surplus therefore is purely gratuitous on 3M's part. Because the Class has no entitlement to any surplus, it obviously has no claim against 3M for an additional surplus.[23] Thus, if there is a surplus

due to 3M's contributions, the Granite investment caused no "losses to the plan."[24]

Nevertheless, the Court cannot determine, from the evidence and arguments the parties have presented, whether the Plan indeed has a surplus as calculated using the methodology mandated by ERISA and *Hughes Aircraft.* Delahanty, 3M's expert, opined that the Plan had a surplus in excess of $300 million at the time the Granite loss was realized, and that surplus now grown to just under $500 million. However, these amounts are premised on Delahanty's own actuarial assumptions which, although perhaps realistic in economic terms, do not appear to be tied to the dictates of ERISA. Likewise, while it is undisputed that 3M has "voluntarily" contributed more to the Plan than required under the Internal Revenue Code since the Granite loss, 3M has not shown whether or not these contributions have created a surplus as defined by ERISA. If these contributions have not resulted in a fully funded position, then 3M has not recouped fully the cognizable loss to the Plan. Correspondingly, although Class counsel challenged Delahanty's calculations based on actuarial assumptions contained OBRA and the RPA, the Class has not offered affirmative evidence that the Plan indeed is underfunded.

The Class has provided uncontroverted evidence that the Granite investment caused at least a potential loss to the Plan of as much as $80 million. Whether the Plan has a surplus remains an open question. Given this record, the Court finds that fact disputes preclude summary judgment at this point. However, if either

---

22. Also, the Class points out that the calculation of what constitutes a surplus at the time of termination is different than at other times and is based on very conservative assumptions.

23. The Court notes that while the *Hughes Aircraft* analysis controls in this case, its applicability to other contexts is limited. For example, nothing in *Hughes Aircraft* precludes recovery of defined benefit plan assets or profits that have been wrongfully retained by

others. Also, because the analysis in *Hughes Aircraft* depends on the relationship between participants in a defined benefit plan and the employer-sponsor that makes contributions to the plan, it appears to apply only to fiduciaries that are employers.

24. Likewise, if there is no surplus, but the underfunding of the Plan is less than the amount of the loss associated with the Granite investment, then the Class's damages are limited to the amount of underfunding.

party believes that the issue of whether the Plan has a surplus, as defined under ERISA and *Hughes Aircraft*, is capable of resolution on a motion for summary judgment, it may move the Court within ten (10) days of this Order for leave to file such a motion. Within the same time period, either party may move the Court for limited discovery on this matter.[25]

## III. Causation

■ 3M argues that, even if the Class is able to establish a breach of fiduciary duty and a loss, there is insufficient evidence in the record to create a genuine fact dispute as to whether the breach caused the loss. Specifically, it asserts the alleged breach did not cause the loss because reasonable fiduciaries who had complied with the standard of care could have disagreed about whether to make the investment. In support of this contention, 3M points out that over ninety other sophisticated investors chose to invest in Granite and that three of its experts have opined that reasonable minds could differ as to whether the Granite investment was reasonably prudent.

The Court finds that fact disputes preclude summary judgment on this issue. As indicated previously, Eighth Circuit law requires that 3M bear the burden of proof on causation once the Class has established a prima facie case of breach and loss. *See, e.g., Roth*, 16 F.3d at 917 (quoting *Martin*, 965 F.2d at 671). Although 3M has presented substantial evidence in its favor, it has not established a lack of causation as a matter of law.[26]

■ The Court agrees with 3M that there is no causal link between an alleged breach of fiduciary duty and an investment loss if a hypothetically prudent fiduciary would have made the same investment.

*Roth*, 16 F.3d at 919 ("Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway."). In addition, if "reasonable minds" of fiduciaries confronting the same circumstances can differ on the prudence of the investment, 3M is entitled to judgment in its favor. *See, e.g., In re Unisys Sav. Plan Litig.*, No. 91–3067, 1997 WL 732473, at *25 (E.D.Pa. Nov.24, 1997); *see also Stewart v. National Shopmen Pension Fund*, 795 F.2d 1079, 1083 (D.C.Cir.1986) ("Choices between reasonable alternatives . . . are for the trustees, not the counts.").

However, the Court rejects 3M's suggestion that simply because ninety other sophisticated investors chose to invest in Granite, a prudent fiduciary in 3M's position would have made the investment. This fact alone is unpersuasive since the circumstances under which these investors decided to invest in Granite is not known and because ninety is not an inherently impressive number given the universe of sophisticated and institutional investors.[27] Moreover, as set forth previously, the Court disagrees with 3M that there is no evidence that diligent investigation and monitoring would have revealed facts that would persuade a prudent investor in 3M's position to avoid investing in Granite. The Class has offered significant evidence of undiscovered, unanalyzed, and undiscussed facts relating to the risks of the Granite strategy, the characteristics of the CMO market, the difficulties in evaluating and valuing CMOs, the nature of ACM's compensation and incentives, and Granite's leveraged and hedged position. Although 3M suggests that the Class's claim is based on "hindsight evidence," the Class has provided evidence that much of this

---

25. If the Court grants further discovery and leave to file another summary judgment motion, it will order an accelerated discovery and briefing schedule and will restrict the length of memoranda.

26. Although it need not reach the issue, the Court notes that even if 3M did not bear the

burden on this issue, fact disputes would preclude summary judgment.

27. While the Court does not accept the Class's bold assertion that all ninety of these investors were "speculators," this number is not decisive without some additional context.

information could have been gleaned from sources available before and during the Granite investment.[28]

3M's offers facially stronger evidence of the lack of causation in the form of opinions of three investment experts, who contend that they would have endorsed 3M's decision to invest in Granite at the time. The Class does not offer directly contrary expert opinions, but suggests that these three hindsight opinions deserve little weight because none of these retained experts recommended Granite to their clients at the time. In addition, the Class again points to the significant expert and other evidence in the record of various "red flags" regarding the investment that 3M would have discovered with greater diligence. Although these opinions may persuade a fact finder, given that they are not definitively impartial, and given all of the Class's evidence of available information that would have raised serious concerns about the risks and appropriateness of the Granite investment, the Court cannot conclude that these opinions establish as a matter of law that reasonable minds could differ as to the prudence of the investment. 3M's motion for summary judgment therefore must be denied.

## ORDER

Based on the foregoing, and all of the records, files and proceedings herein, **IT IS HEREBY ORDERED:**

1. Plaintiffs' motion for partial summary judgment [Docket No. 63] is **DENIED.**

2. Defendant's cross-motion to dismiss, or in the alternative for summary judgment on plaintiff's prohibited transaction claim [Docket No. 78] is **GRANTED,** and this claim is **DISMISSED WITH PREJUDICE.**

3. Defendant's motion for summary judgment [Docket No. 70] is **DENIED.**

4. Either party may, within ten (10) days of the date of this Order, move the Court for leave to file a motion for summary judgment on the issue of whether the Plan has a surplus. Either party may also, within ten (10) days of this Order, move the Court for leave to conduct limited discovery on this issue.

---

28. Information regarding Askin's fraudulent asset valuations in 1994, the alleged collusion between dealers to cripple Askin, and the allegedly unprecedented rise in interest rates, obviously was not available to 3M prior to or during the time of the investment. To the extent portions of the Granite loss are attributable to reasonably unforeseeable events, 3M obviously cannot be held accountable for such losses. However, there is no evidence before the Court that establishes whether certain events—such as the rise in interest rates—indeed were unforeseeable or the percentage of the loss, if any, that was attributable to such occurrences.